464 S.E.2d 741

**Irene HANLON, Plaintiff Below, Appellant,**

v.

**Terry CHAMBERS, Individually and DBA Chambers Chiropractic Offices, C.C., Defendant Below, Appellee.**

No. 22595.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 13, 1995.

Decided Oct. 26, 1995.

Lauren Clingan, David M. Hammer, and Robert J. Schiavoni, Hammer, Ferretti & Schiavoni, Martinsburg, for Appellant.

Barry P. Beck, Martin & Seibert, Martinsburg, for Appellee.

CLECKLEY, Justice:

The plaintiff below and appellant herein, Irene Hanlon, appeals an order of the Circuit Court of Berkeley County granting summary judgment in favor of the defendant below and appellee herein, Terry Chambers, who was sued individually and through his business, the Chambers Chiropractic Offices, C.C.

## I.

## FACTUAL AND PROCEDURAL HISTORY

From January 6, 1992, until April 15, 1993, the plaintiff worked as a Marketing Director

at the Chambers Chiropractic Offices, which is owned and operated by Terry Chambers. The precise scope of the plaintiff's responsibilities and supervisory authority is disputed. The plaintiff admits she had the duty to supervise the office, but she denies she had the authority to make personnel decisions and, in particular, to fire other employees without consultation with the defendant, Dr. Chambers. The defendant asserts, however, that the plaintiff "had direct supervisory responsibility for all employees within the Marketing Department, including the authority to hire, discipline and terminate."

One of the employees supervised by the plaintiff during her employment with the defendant was Jim Embrey. Mr. Embrey was hired during January of 1993, as a part-time hourly employee. The plaintiff asserts she was sexually harassed by Mr. Embrey during her employment with the defendant and she informed the defendant about Mr. Embrey's behavior. Plaintiff stated during her deposition that, on two occasions, she informed the defendant she could handle the situation. She also testified the defendant never did anything to discourage her from disciplining Mr. Embrey.

In March of 1992, the defendant hired a management consultant to study his chiropractic business. The defendant maintains that the consultant recommended eliminating the plaintiff's position and that the recommendation prompted her subsequent release. On April 9, 1993, prior to the defendant's informing the plaintiff of her layoff, the plaintiff requested a meeting with the defendant and his office manager, Donna Hollida, to discuss Mr. Embrey's actions. The defendant asserts that he investigated the plaintiff's claims immediately after the meeting on April 9, and that he proceeded with his plan to eliminate the Marketing Director position, after concluding there was insufficient evidence to justify the plaintiff's claims of sexual harassment.

The plaintiff filed her complaint with the Berkeley County Circuit Court on October 4, 1993, alleging two theories: (1) the defendant fired her in retaliation for her complaints about the sexual harassment, and (2) the defendant failed to "maintain a work environment free from sexual harassment by failing to promptly investigate complaints of sexual harassment and by failing to take necessary remedial actions." After limited discovery [1], the defendant moved for summary judgment. In a written order dated April 6, 1994, the circuit court granted the defendant's motion finding the plaintiff either had direct supervisory authority, as suggested by the defendant, or at least had the power to recommend personnel decisions to the defendant. The circuit court noted "[s]exual harassment in the workplace is essentially an abuse of power" and thus interpreted the West Virginia Human Rights Act, W.Va.Code, 5–11–1, *et seq.*, as protecting powerless employees who have no other legitimate avenue of relief. Furthermore, the circuit court held that supervisors, as agents of the employer, have the responsibility to prevent sexual harassment in the workplace. The circuit court reasoned that permitting supervisors to sue employers for the harassment by subordinates would subject employers to the "ultimate 'Catch–22' " by forcing them to hire supervisors to watch supervisors and so on.

The circuit court thus ruled in favor of the defendant based on its determination that supervisory employees may not maintain a cause of action against an employer for the sexual harassment of the supervisor by a subordinate employee. The circuit court also concluded that complaints about subordinate harassment could not, therefore, be in opposition to "any practices or acts forbidden under" the Human Rights Act. W.Va.Code 5–11–9(7)(C) (1992). As a consequence, the circuit court also dismissed the plaintiff's retaliatory discharge claim. The plaintiff appeals from the entry of the summary judgment.

## II.

### DISCUSSION

#### A.

##### *Standard of Review*

When considering a circuit court's grant of summary judgment, this Court not-

1. The defendant disputes the plaintiff's claim that discovery was inadequate.

ed in Syllabus Points 1 and 2 of *Jones v. Wesbanco Bank Parkersburg,* 194 W.Va. 381, 460 S.E.2d 627 (1995):

> "1. 'A circuit court's entry of summary judgment is reviewed *de novo.*' Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).

> "2. ' " 'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992).' Syl. pt. 2, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994)."

A motion for summary judgment may not be granted unless the circuit court determines there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See, e.g.* W.Va. R.Civ.P 56(c). *See generally Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.E.2d 265 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment; in assessing the record to determine whether there is a genuine issue as to any material facts, the circuit court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. The inferences to be drawn from the underlying affidavits, exhibits, answers to interrogatories, and depositions must be viewed in the light most favorable to the party opposing the motion.

■ On a motion for summary judgment, neither a trial nor appellate court can try issues of fact; a determination can only be made as to whether there are issues to be tried. To be specific, if there is any evidence in the record from any source from which a reasonable inference can be drawn in favor of the nonmoving party, summary judgment is improper. As succinctly stated in both *Peavy* and *Williams,* in reviewing a grant of summary judgment, this Court is governed by the same principles and we review the record *de novo.*

■ Although we have said that Rule 56 of the West Virginia Rules of Civil Procedure applies equally to claims of discrimination,[2] we suggested in *Williams* a cautious approach to summary judgment motions where issues of motive and intent must be resolved.[3] In most discrimination cases, once a plaintiff's allegations and evidence create a *prima facie* case (showing circumstances that permit an inference of discrimination on an impermissible bias), unless the employer comes forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no

2. Even in discrimination cases, "summary judgment may be appropriate" where the party resisting judgment relies "upon conclusory allegations, improbable inferences, and unsupported speculation" as to any essential element in the claim. *See Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

3. In general, a plaintiff asserting an employment harassment or discrimination claim has the burden at the outset of presenting evidence sufficient to establish a prima facie case of harassment or discrimination. *See Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 504–507, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407, 415–16 (1993) ("*Hicks*"). Once the plaintiff has adduced evidence sufficient to establish a prima facie case, the employer must then come forward with reasons justifying a finding that unlawful discrimination was not the cause of the employment action. If the employer succeeds, the presumption of discrimination raised by the plaintiff's prima facie case showing "drops out of the picture." *Hicks,* 509 U.S. at 510, 113 S.Ct. at 2749, 125 L.Ed.2d at 418. Although the plaintiff has the ultimate burden of persuasion to demonstrate that the challenged employment discrimination was the result of illegal conduct by the employer, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision. The plaintiff is only required to show that the reasons were not the only factors and that the prohibited factor was at least one of the motivating factors. *See, e.g. Price Waterhouse v. Hopkins,* 490 U.S. 228, 247–49, 109 S.Ct. 1775, 1788–90, 104 L.Ed.2d 268, 285–87 (1989), *superseded by statute as stated in Stender v. Lucky Stores, Inc.,* 780 F.Supp. 1302 (N.D.Cal.1992).

rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder at trial. *See generally Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995).[4]

It is significant to understand that in discrimination cases, although the plaintiff has the ultimate burden of proving elements of the claim by a preponderance of the evidence, the showing the plaintiff must make as to the elements of the *prima facie* case in order to defeat a motion for summary judgment is "de minimis." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2nd Cir.1994). In determining whether the plaintiff has met the *de minimis* initial burden of showing

> " 'circumstances giving rise to an inference of discrimination,' the function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.' " *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2nd Cir.1995). (Citation omitted).

To be sure, summary judgment has a special niche in civil litigation. Its role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether a trial is actually required. The device allows courts and litigants to avoid full blown trials in unwinnable cases, thus con-

serving the parties' time and money and permitting courts to husband scarce judicial resources. However, although summary judgment is the appropriate device for putting a swift end to meritless litigation, Rule 56(c) of the Rules of Civil Procedure [5] implicitly forbids courts from entering summary judgment where there are material and genuine issues of fact to be resolved.

Even "[i]f there is no genuine issue of material fact in dispute, ... we [must] next determine if the substantive law was correctly applied by the ... [circuit] court." *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 781 (10th Cir.1995). Based upon our *de novo* review of the record, we find the circuit court erred in its interpretation and application of the applicable law and in its holding that no genuine issues of material fact exist.

### B.

### *Subordinate Harassment of a Supervisor*

The defendant asserts that summary judgment should be upheld because the Human Rights Act does not provide for a cause of action against employers by supervisory employees who claim to have been sexually harassed by subordinate employees. We reject the defendant's contention.

To establish a claim for sexual harassment based upon a hostile or abusive work environment under the Human Rights Act, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was " 'sufficiently severe or pervasive to alter

---

4. In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the circuit court must be alert to the fact "[e]mployers are rarely so cooperative as to include a notation in the personnel file" that their actions were motivated by factors expressly forbidden by law. *Thornbrough v. Columbus and Greenville Railroad Co.,* 760 F.2d 633, 638 (5th Cir.1985), *abrogated by St. Mary's Honor Center v. Hicks, supra.* As a result, a victim of discrimination is seldom able to prove a claim by direct evidence and is usually constrained to rely on circumstantial evidence.

5. Rule 56(c) of the Rules of Civil Procedure states:

> *"Motion and proceedings thereon.*—The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

the ... [plaintiff's] conditions of employment and create an abusive work environment'"; and (4) it was imputable on some factual basis to the employer. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301–02 (1993). (Citation omitted).

█ Certainly, a supervisor is an employee under the Human Rights Act,[6] at least where the individual is not a partner, owner, or part-owner.[7] The defendant does not seriously dispute this conclusion, but argues that supervisors-employees (or at least some of them) do not enjoy the same level of protection from sexual harassment.

█ Our case law, *Westmoreland Coal Co. v. West Virginia Human Rights Commission*, 181 W.Va. 368, 382 S.E.2d 562 (1989); the Human Rights Commission (HRC) regulations, 6 W.Va.C.S.R. § 77–4–3 (1992); the federal authorities, *Harris v. Forklift Systems, Inc.*, *supra*; *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); and the Equal Employment Opportunity Commission (EEOC) regulations, 29 C.F.R. § 1604.11 (1980), recognize two types of sexual harassment. First, in *quid pro quo* harassment, an employer or its agent conditions an employee's job, employment benefits, or continued employment on his or her consent to participate in sex. Second, in hostile environment harassment, which is alleged here, an employer "discriminate[s] against ... [a female

employee] with respect to ... conditions or privileges of employment[,]" when the workplace is infected, for example, by sexual barbs or innuendos, offensive touching, or dirty tricks aimed at the employee because of her gender. W.Va.Code, 5–11–9(1) (1992). In these cases, women are denied an equal *opportunity in the workplace because, unlike their male counterparts, they must work in an atmosphere they find emotionally oppressive.*

Creating a *per se* rule that prohibits recovery by supervisors removes a distinct group of individuals from the protection of the Act. As mentioned above, *see* note 6, *supra*, the Human Rights Act is a broad statute that attempts to protect the rights of individuals. Nothing in the Act cautions against its application to claims by a supervisor. Moreover, the legislative rules support protection of supervisors. Section 2.2 of 6 W.Va.C.S.R. § 77–4–2 (1992) defines the parameters of sexual harassment:

"2.2 Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

\* \* \* \* \* \*

"2.2.3 Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

*West Va. Human Rights Comm'n*, 191 W.Va. 161, 162, 444 S.E.2d 39, 40 (1994) ("'[t]he West Virginia Human Rights Act "shall be liberally construed to accomplish its objective and purpose." W.Va.Code, 5–11–15 (1967)[,]' " *quoting* Syl. pt. 1, in part, *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990)). Under that standard, the plaintiff was an employee of the defendant: she was hired by him to work at his direction in return for a regular salary. The fact that she also happened to supervise one or more employees hardly removed her from the Act's protection. Indeed, a civil rights law could not be effective if it protected from discrimination only people at the bottom of the ladder.

**6.** W.Va.Code, 5–11–3(c) (1992), defines "employee" only by identifying persons to be excluded: "The term 'employee' shall not include any individual employed by his parents, spouse or child, or in the domestic service of any person[.]" An "employer" is "any person employing twelve or more persons within the state[,]" and "[t]he term 'person' means one or more individuals, partnerships, associations, organizations, corporations, labor organizations, cooperatives, legal representatives, trustees, trustees in bankruptcy, receivers and *other organized groups of persons*[.]" W.Va.Code, 5–11–3(d) & –3(a) (1992), respectively. These sections were amended in 1994. However, the amendments do not affect this case.

These comprehensive definitions make apparent the legislative desire that they be broadly construed to maximize the Act's protection and in a manner consistent with their ordinary, common-sense meaning. *See* W.Va.Code, 5–11–2 (1989) (declaration of legislative policy); *Skaff v.*

**7.** This case does not require us to determine whether partners or co-owners can be employees under the Human Rights Act. *Cf. Hishon v. King & Spalding*, 467 U.S. 69, 79–80, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59, 69–70 (1984) (Powell, J., concurring).

**108**

Additionally, Section 2.1 of 6 W.Va.C.S.R. § 77- 4–2 (1992) interprets the Human Rights Act as affording "employees the right to work in an environment free from discriminatory intimidation, ridicule, or insult." These rules and the Human Rights Act are generally for the express purpose of protecting the rights of all individuals in the employment context.

 When sexual harassment occurs, the identity of the perpetrator is irrelevant to the victimized employee. A hostile environment can be just as oppressive when it is created by co-workers, subordinates, or customers as when it is caused by a superior. Case law under Title VII, EEOC regulations, and HRC regulations concur that co-workers and customers can cause a hostile environment. *E.g., Davis v. Tri–State Mack Distribs., Inc.,* 981 F.2d 340 (8th Cir.1992) (co-workers); *Daniels v. Essex Group, Inc.,* 937 F.2d 1264 (7th Cir.1991) (co-workers); *EEOC v. Sage Realty Corp.,* 507 F.Supp. 599 (S.D.N.Y.1981) (customers); *King v. Chrysler Corp.,* 812 F.Supp. 151 (E.D.Mo.E.D. 1993) (patrons); 29 C.F.R. § 1604.11(d) (1980) (fellow employees); 29 C.F.R. § 1604.11(e) (1980) (non-employees); 6 W.Va. C.S.R. § 77–4–3.2 (1992) (co-workers).[8] We see no reason in the Human Rights Act or in right and reason to reach a different result when the hostile environment is created by a subordinate. Put another way, we hold that the Human Rights Act imposes a duty on employers in this State to ensure that workplaces are free of sexual harassment from whatever source.

 An employer, however, is not strictly liable, at least not in all cases, for sexual harassment and proof of a hostile environment does not automatically establish employer liability. It is at this point that the source of the harassment becomes relevant. Where an agent or supervisor of an employer has caused, contributed to, or acquiesced in the harassment, then such conduct is attributed to the employer, and it can be fairly said that the employer is strictly liable for the damages that result. When the source of the harassment is a person's co-workers and does not include management personnel, the employer's liability is determined by its knowledge of the offending conduct, the effectiveness of its remedial procedures, and the adequacy of its response. Thus, an employer that has established clear rules forbidding sexual harassment and has provided an effective mechanism for receiving, investigating, and resolving complaints of harassment may not be liable in a case of co-worker harassment where the employer had neither knowledge of the misconduct nor reason to know of it.[9] In such a case, the employer has done all that it can do to prevent harassment, and the employer cannot be charged with responsibility for the victim's failure to complain.[10]

 We see no reason for a different analysis to apply where the harasser is a subordinate of the victim. The employer's duty remains the same: it must do what it can to prevent harassment and must respond swiftly and effectively to complaints about harassment. The sufficiency of the employer's response determines its legal responsibility. It is not irrelevant in making that determination, however, that the harassing employee was a subordinate of his victim; that fact is just not an end-all. Each case will turn on its own particular circumstances. For example, if a supervisor complains to her

**8.** 6 W.Va.C.S.R. § 77–4–3.2 (1992) provides:
 "With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knew or reasonably should have known of such conduct, or expressly or implied authorized or ratified such conduct. As a defense an employer may show that it took timely and appropriate corrective action regarding such conduct."

**9.** "Knowledge of work place misconduct may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with ... [the West Virginia Human Rights Act] would be aware of the conduct." *Spicer v. Commonwealth of Virginia,* 66 F.3d 705, 710 (4th Cir.1995) (*en banc*).

**10.** This does assume the employer has an *effective* complaint procedure. *See generally Meritor Savings Bank v. Vinson,* 477 U.S. at 72–73, 106 S.Ct. at 2408, 91 L.Ed.2d at 62–63.

employer of a subordinate's harassment and the employer responds, "You take care of it," that may in some cases be sufficient—if the supervisor has full disciplinary authority and circumstances permit use of it. In other cases, however, that response may be inadequate. The harassed supervisor could be the object of an entire crew of male harassers and would likely need greater assistance from her employer than a flippant, "You handle it." Similarly, the power to discipline a six-foot, five-inch, 300–pound ex-felon with a history of violence may not be terribly comforting to a lot of women supervisors. The point is that common sense must be applied to the facts in each case to determine whether the employer took direct and prompt action " 'reasonably calculated' to end the harassment." B. Lindemann & D.D. Kadue, Sexual Harassment in Employment Law 195–96 (1992), *citing Waltman v. International Paper Co.*, 875 F.2d 468, 469 (5th Cir.1989). *See also Huddleston v. Roger Dean Chevrolet*, 845 F.2d 900 (11th Cir.1988); *Barrett v. Omaha National Bank*, 726 F.2d 424 (8th Cir.1984).[11]

 The facts in this case are ambiguous. According to the plaintiff, when she informed the defendant of Mr. Embrey's conduct, the doctor responded, "Can you handle it?" and she said she could. The defendant disputes this assertion. Whether that was enough requires factual development. The nature of the conversation between the parties, the personalities of the plaintiff and Mr. Embrey, the clarity and extent of the plaintiff's authority to discipline Mr. Embrey,[12] the employer's past practices with respect to per-

sonnel matters, the existence of a disciplinary grievance process, and the nature of the alleged harassment—to name a few potentially relevant considerations—could all weigh on assessing the sufficiency and validity of the defendant's response. Of course, the factfinder could also conclude that it believes the defendant's version that the conversations never occurred and that he did not learn of the alleged harassment until shortly before the plaintiff's discharge. We intimate no view on how these factual issues should be resolved. Rather, we simply emphasize that this is a very fact-specific case that requires very careful factual determinations.[13]

The defendant and the circuit court have contended that fair employment laws generally, and sexual harassment doctrines in particular, reflect a legislative desire to protect workers in protected classes from injury caused by an abuse of power; therefore, they contend the law does not extend to a subordinate's harassment of a supervisor. To be sure, Title VII and the Human Rights Act do address power imbalances in the employment context; the statutes reflect a recognition that protected classes historically have been concentrated in the lower rungs of the workplace hierarchy and their members are vulnerable. *See, e.g., International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Certainly, the typical *quid pro quo* sexual harassment case involves a supervisor using his or her authority over a subordinate to control and/or intimidate the subordinate. It would be difficult to conceive how any employer or

11. Although we use gender specific terms in this case, we recognize the possibility that any individual, male or female, may be sexually harassed.

12. The extent of the plaintiff's authority was sharply disputed by the parties. It is clearly a relevant fact and could have a substantial impact on the ultimate factual resolution of this case. Contrary to the circuit court's indications, however, we do not believe that fact is, standing alone, dispositive. Even if the plaintiff had the authority to fire Mr. Embrey, the defendant still had a duty to provide an harassment-free work environment, and a variety of circumstances could lead one to the conclusion that he had to do more than simply rely on the plaintiff's disciplinary authority. Certainly, a supervisor might be reluctant to impose serious discipline without

the complete backing of the employer. Moreover, in the context of cases such as this one, the supervisor is necessarily both the accuser and the victim, and reasonable management practice might dictate that discipline should therefore be imposed by someone other than the accusing supervisor. It is up to the circuit court to sort through these and other relevant factors to reach an appropriate resolution.

13. For a good discussion of the factual subleties and a common sense analysis of them, regarding both the level of misconduct that constitutes harassment and the sufficiency of an employer's response to complaints about harassment, *see* Judge Posner's opinion in *Baskerville v. Culligan, Co.*, 50 F.3d 428 (7th Cir.1995).

agent could exact a *quid* if the person did not have the power to provide the *quo*.[14]

Having conceded the above, we do not see how perceiving the fair employment laws as primarily, or even exclusively, concerned with an abuse of power prevents this case from going forward. To conclude that a supervisor harassed by subordinates cannot be victimized by an abuse of power would ignore the reality of what women encounter in the workplace. For example, a female supervisor who is set upon by male subordinates and targeted to be a failure would surely be a victim of male dominance. (This would be especially true if the workplace traditionally has been a male environment.) A supervisor assaulted by a male subordinate of superior physical strength or subjected to repeated exposure to pornography is in each case a victim of a male-ordered hierarchy.[15] Nor do we necessarily agree with the circuit court's conclusion that the alleged harassment in this case could not have involved an abuse of power because the harassment came from a subordinate. If the plaintiff proves employer insensitivity or unconcern, she proves an abuse. If the plaintiff proves a "good ole' boy" environment in which the employer tolerated Mr. Embrey's behavior and failed to back women managers, she proves an abuse. If the plaintiff proves that Mr. Embrey created in her a reasonable fear of physical retaliation or a fear for her own safety, she proves an abuse. These are just examples, but they illustrate that the interaction of power and gender in the workplace cannot be reduced to mechanical inquiries about the relative status of the plaintiff in the employment hierarchy.

■ The bottom line, however, is that it does not really matter for purposes of the Human Rights Act whether the plaintiff was a victim of a power play. We do not perceive "discrimination" as necessarily synonymous with an abuse of power. More importantly, we do not find an inquiry into power to be a useful part of our fair employment doctrine. As a practical matter, any doctrinal standard that includes a requirement that a plaintiff must establish some abuse of power is simply unworkable. The concept is far too subtle and formless [16] for judges and juries to apply in a consistent manner, especially in hostile environment cases. Instead, we believe that a doctrine that first inquires into whether the plaintiff was subjected to a sexually hostile work environment, then decides if the employer knew or should have known of the hostility, and concludes by gauging the sufficiency of the employer's response provides both a workable framework and a fair accommodation of employer and employee interests.[17]

Whether the plaintiff's work environment was hostile and whether the defendant-employer met his duty in this particular case were clearly matters of factual dispute. A remand for development and findings of facts is therefore necessary.

---

**14.** The pioneer work by Cathcrine MacKinnon entitled Sexual Harassment of Working Women (1979) demonstrated and emphasized the role of male power and domination in sexual harassment. Ms. MacKinnon's subsequent works have elaborated, in a variety of contexts, on the interrelationship between male domination and both physical and civil rights abuses of women. *See, e.g.*, Cathcrine MacKinnon, Feminism Unmodified (1987); Cathcrine MacKinnon, Only Words (1993).

**15.** *See, e.g.*, the works cited in note 14, *supra*.

**16.** As we discussed above, to conclude that a subordinate's harassment of a supervisor can never be an abuse of power takes too simplistic a view of workplace and gender power relationships. What we say here, however, is that determining when power is abused in cases of subordinate harassment of a supervisor requires an appreciation of subtleties that is not easily articu-

lated nor conducive to consistent application. Given the existence of more objective inquiries, we see no utility in further engaging in a power analysis.

**17.** In other words, we do not equate the third element in a sexual harassment claim, i.e., that the plaintiff must prove an "abusive work environment," with a requirement that she establish "an abuse of power." A woman's workplace becomes "abusive" as a result of conduct directed at her from whatever source: the focus is on the woman and what she is made to experience and feel in that environment. An abuse of power inquiry focuses on the wrongdoers and their status and, necessarily, only on those wrongdoers who have the power to abuse. The text of this opinion makes it clear that we require the former broader inquiry.

## C.

### *Retaliation*

■■■■ The plaintiff also claims the defendant violated the Human Rights Act when he discharged her because he allegedly did so in retaliation for her complaints about Mr. Embrey's sexual harassment. Thus, the plaintiff contends the discharge effected a retaliation against her for her opposition to an employment practice made unlawful by the Act. W.Va.Code, 5–11–9(7)(C). To establish such a claim by circumstantial evidence, the plaintiff must adduce facts sufficient to raise an inference that retaliatory motive played a part in her removal. In Syllabus Point 1 of *Brammer v. Human Rights Commission,* 183 W.Va. 108, 394 S.E.2d 340 (1990), we described a set of facts that would create a *prima facie* case of retaliation:

> " 'In an action to redress an unlawful retaliatory discharge under the West Virginia Human Rights Act, *W.Va.Code,* 5–11–1, *et seq.,* as amended, the burden is upon the complainant to prove by a preponderance of the evidence (1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation), (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation.' Syl. pt. 4, *Frank's Shoe Store v. West Virginia Human Rights Commission,* 179 W.Va. 53, 365 S.E.2d 251 (1986)." [18]

The defendant contends, among other things, that the plaintiff failed to establish this *prima facie* case because she had not engaged in protected activity, *i.e.,* she had not opposed a practice prohibited by the Act. Under the defendant's theory, there was no protected opposition because the plaintiff complained about a subordinate's harassment of her, and such harassment was not a practice prohibited by the Act. Thus, even if the plaintiff complained, and even if the defendant discharged her because of those complaints, she still could not state a claim for relief since her complaints did not pertain to a prohibited practice. We have already ruled that subordinate harassment *can* violate the Act. That fact alone requires reversal. For reasons stated below, we also conclude the circuit court applied an incorrect standard for determining when the opposition clause in W.Va.Code, 5–11–9(7), may be invoked.

Under W.Va.Code, 5–11–9(7)(C), protected opposition is that which challenges "any practices or acts forbidden under this [Act]." Although we have not previously had an occasion to apply that language, numerous courts have construed similar language in Section (7)(C)'s federal analogue, Title VII of the Civil Rights Act of 1964, § 704(b), 42 U.S.C. § 2000e–3(a).[19] Some of those courts have held that opposition is protected if the plaintiff-employee had a good faith belief that the practice opposed violated the statute, *e.g., Monteiro v. Poole Silver Co.,* 615 F.2d 4 (1st Cir.1980), while others have used either an objective test, *e.g., Drinkwater v. Union Carbide Corp.,* 904 F.2d 853 (3rd Cir.1990) (reasonable belief); *Berg v. LaCrosse Cooler Co.,* 612 F.2d 1041 (7th Cir.1980) (reasonable belief); *Learned v. City of Bellevue,* 860 F.2d 928 (9th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1530, 103 L.Ed.2d 835 (1989); or required both good faith and a reasonable belief in the illegality of the opposed practice. *Holland v. Jefferson National Life Ins. Co.,* 883 F.2d 1307 (7th Cir.1989); *Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179 (7th Cir.1982); *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491 (11th Cir.

**18.** As is indicated by the parenthetical between factors (3) and (4), a temporal relationship between the protected conduct and the discharge is not the only, or a required, basis for establishing a causal relationship between the two. We need not go beyond the *Brammer/Frank's* factors in this case, however, because the plaintiff alleged she was discharged within one week after discussing Mr. Embrey's alleged harassment with the defendant. Illegal retaliation can also come in forms other than a discharge.

**19.** Section 704(b) makes it unlawful for an employer to discriminate against any employee or applicant "because he has opposed any practice made an unlawful employment practice by this" title.

1989). Another and decidedly minority view would not protect opposition unless it opposed a practice that actually violated Title VII. *E.g., Silver v. KCA, Inc.,* 586 F.2d 138 (9th Cir.1978).[20] *See generally* Barbara Schlei & Paul Grossman, Employment Discrimination Law 543–48 (2nd ed. 1983 & Cum.Supp. 223–24 (1989)).

We have repeatedly held that we will construe the Human Rights Act to coincide with the prevailing federal application of Title VII unless there are variations in the statutory language that call for divergent applications or there are some other compelling reasons justifying a different result. *E.g., Barefoot v. Sundale Nursing Home,* 193 W.Va. at 482, 457 S.E.2d at 159; *West Virginia Univ. v. Decker,* 191 W.Va. 567, 447 S.E.2d 259 (1994); *Westmoreland Coal Co. v. West Virginia Human Rights Comm'n, supra; State ex rel. State Human Rights Comm'n v. Logan–Mingo Area Mental Health Agency, Inc.,* 174 W.Va. 711, 329 S.E.2d 77 (1985); *Shepherdstown V.F.D. v. West Virginia Human Rights Comm'n,* 172 W.Va. 627, 309 S.E.2d 342 (1983). Our sense of the prevailing federal standard is that a plaintiff seeking relief under Section 704(a)'s Opposition Clause must show that his or her opposition concerned practices that he or she believed were violations of the statute.

We see neither a variation in language nor a good reason to diverge from that standard with regard to W.Va.Code, 5–11–9(7)(C). In fact, there are compelling reasons why the section must be so construed. The legislative purpose in including the antiretaliation provision was obviously to encourage people to come forward and expose unlawful employment practices and to do so without fear of reprisal. By protecting reasonable, good faith opposition, the provision also advances the statutory purpose of ending discrimination by engaging private citizens to help serve as "private attorneys general." An absence of such protection would create a chilling effect on employees' willingness to join the fight. The overriding purposes of W.Va.Code, 5–11–9(7)(C), would be wholly defeated if its protection applied only to those individuals who confidently know the technical area of fair employment law and who correctly predict how its doctrine will ultimately be applied in a court of law. Given those unpredictable variables, few rational employees would take much solace in the protection from retaliation offered by such a narrow construction of W.Va.Code, 5–11–9(7)(C).

This case illustrates another example supporting the prevailing federal view, that is, in hostile environment harassment cases (sexual, racial, or whatever), the offensive conduct often does not rise to the level of actionability until after there has been a significant accumulation of incidents. Both employees and employers would benefit from a standard that encourages harassed employees to come forward early, well before the ephemeral line of legal liability has been crossed, in order to root out the problem before it grows into an unmanageable and costly crisis. *See generally* Syl. pt. 2, in part, *Curry v. Gatson,* 180 W.Va. 272, 376 S.E.2d 166 (1988) ("if an employee is sexually or racially harassed at the workplace and this discriminatory treatment would cause a reasonably prudent person to resign, such employee is not disqualified from receiving unemployment compensation benefits").

■ Accordingly, we hold that W.Va. Code, 5–11–9(7)(C), prohibits an employer or other person from retaliating against any individual for expressing opposition to a practice that he or she reasonably and in good faith believes violates the provisions of the Human Rights Act. This standard has both an objective and a subjective element. The employee's opposition must be reasonable in the sense that it must be based on a set of facts and a legal theory that are plausible. Further, the view must be honestly held and be more than a cover for troublemaking.

■ In applying this standard to the plaintiff, we have no difficulty in concluding that her objections to Mr. Embrey's conduct

---

**20.** The *Silver* decision would appear to have been superseded by subsequent Ninth Circuit decisions that looked only to the reasonableness of the plaintiff's opposition. *Learned, supra; EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008 (9th Cir.1983); *Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir.1978).

brought her within the opposition clause of W.Va.Code, 5–11–9(7). Certainly it was reasonable for her to conclude that, if Mr. Embrey's offensive touching and innuendos continued, they would create a hostile work environment and deprive her, on the basis of her sex, of a valued condition of employment. Even if, as the defendant contends, a supervising employee could not, as a matter of law, be harassed by a subordinate, the plaintiff reasonably could have concluded that a subordinate's harassment would violate the Human Rights Act. Of course, we have now concluded that her belief was not only reasonable, but it was also correct.[21]

It is not contested that the plaintiff complained about harassment on at least one occasion. Such a complaint is protected opposition. The plaintiff alleged she was fired within a week after her last complaint. Because of the obvious temporal proximity of the discharge to the protected activity, the plaintiff stated a *prima facie* case. The defendant's response that her discharge was the result of the recommendation of an expert management consultant simply put the matter of motive at issue. The plaintiff must have an opportunity to show that the proffered explanation was pretextual or that a retaliatory motive at least contributed to the discharge decision. Obviously, these matters raise substantial factual issues. Accordingly,

we remand the retaliation claim to the circuit court for a determination of those issues.

### D.

### *Employer's Concerns*

We add this final section to address a set of concerns that were raised by the circuit court in its decision and by the defendant in this appeal and that cut across both the harassment and retaliation claims.

The circuit court found the plaintiff could not fit within the sexual harassment doctrine because supervisors, as agents of the employer, are responsible for preventing sexual harassment in the workplace. The circuit court feared that providing supervisors with a cause of action would subject employers to the "ultimate 'Catch–22' "—that is, as best we can understand, employers have to rely on supervisors to execute sexual harassment policies, but if a supervisor fails to execute the policy and becomes the object of harassment, to permit her recovery would make the employer liable for the supervisor's own failure. Accordingly, the defendant maintains that the Human Rights Act should not impose liability on an employer if its supervisor "allows herself to be sexually harassed by her subordinates." This reasoning, if it can be called that, leads to the further argument that the defendant had a legitimate reason for discharging the plaintiff (separate from

---

**21.** That fact alone distinguishes the two authorities upon which the defendant places primary reliance. Applying Section 704(a) of Title VII, *Crowley v. Prince George's County, Md.*, 890 F.2d 683 (4th Cir.1989), held that complaints about racial harassment of citizens by the defendant's police department were not protected opposition, and *Holden v. Owens–Illinois, Inc.*, 793 F.2d 745 (6th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986), reached the same conclusion regarding a plaintiff's efforts to implement an affirmative action plan. For additional reasons, we do not believe that these decisions are inconsistent with our ruling. The Fourth Circuit concluded in *Crowley* that the plaintiff's opposition to racial harassment of citizens by police was not protected activity because such harassment is not even an employment practice, which is all that Title VII governs. The *Holden* court concluded that aggressive and zealous efforts to implement an affirmative action plan under Executive Order 11,246 did not oppose any practice made unlawful by Title VII because not only does that statute not require employers to have affirmative action plans, but

Section 703(j), 42 U.S.C. § 2000e–2(j), expressly provides that nothing in the statute " 'shall be interpreted to require any employer ... to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group[.]' " Given those facts and the clarity of Title VII's nonapplication to the opposed practices, the court in each of those cases could legitimately conclude that the plaintiff's belief that he was opposing a Title VII violation was not reasonable.

We express no opinion about whether we would reach the same conclusions applying the reasonable, good faith standard. We point out, however, that *Crowley* 's facts *might* not produce the same result under our Human Rights Act because Section (7)(C) protects opposition to not only unlawful employment practices (as is the case with Title VII), but also to other forms of discrimination prohibited by the Act. W.Va. Code, 5–11–9(6) and –9(7)(A) (1992), could be relevant in such a case.

the consultant's recommendation) because when she failed to stop Mr. Embrey's sexual harassment, she failed to perform an important part of her job, *i.e.*, the execution of the employer's policy against sexual harassment. The defendant further maintains that imposing liability in this case would discourage employers from hiring a woman as a supervisor out of a fear that "she could sue him if she fails to perform her job and permits a subordinate to sexually harass her."

We see no "Catch 22" for employers who are told they must adopt reasonable measures to prevent and remedy sexual harassment in the workplace, including sexual harassment of supervisors. Certainly, an employer must rely on supervisors to implement policy, but, as with any other policy, where a supervisor experiences difficulty, an employer may have to do more than simply delegate responsibility. That is especially likely when the supervisor herself is a target of employee misconduct. As we made clear in Part B, *supra*, the nature and extent of action required of an employer will vary with the facts. We also affirmatively reject any suggestion that a supervisor who has been the object of sexual harassment has in some sense "allowed" it to happen. To say that she is a victim of sexual harassment states a legal conclusion: she has been required to work in a hostile environment that has deprived her of reasonable working conditions on the basis of her sex. When an employer learns that such has taken place, his alternative under the Human Rights Act is to investigate and, if need be, root out the harassment; it is not to fire the victim. We refuse to apply the Human Rights Act in such a way as to make the victim the responsible party.

We do not suggest that a female supervisor has any less of a responsibility to implement policy or is to be held to a lesser standard of managerial ability. Rather, we simply ask employers to do the reasonable thing: investigate and respond appropriately to complaints about sexual harassment from whatever source.

It follows, then, that a supervisor's misfortune of being a target of sexual harassment does not provide her employer with a legitimate reason for discharging her. An employer may, of course, demote or even release a supervisor who fails to abide by and execute a sexual harassment policy, including the inability to control subordinates who are engaging in harassment. When the supervisor herself is the victim, however, it would be the rare case when the particular circumstances would warrant her removal rather than the removal of the offending employee. It is the employer's responsibility to provide a work environment free of sexual hostility; if that means the employer must take affirmative measures over and above reliance on a victimized supervisor, then so be it.

Finally, we also emphatically must reject the defendant's contention that we should affirm the circuit court's order because, to do otherwise, would discourage employers from hiring women as supervisors.[22] In the first place, the argument proves too much; to follow it would require us to reject all claims of sexual harassment because employers will be reluctant to hire women out of a fear of future sexual harassment suits. Second, an employer faced with the decision of whether to hire a woman supervisor has two alterna-

---

**22.** Defendant cites *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d. 222 (1st Cir.1976), as support for that proposition. *Hochstadt* sustained an employer's defense to a claim under the Opposition Clause in Section 704(a), 42 U.S.C. § 2000e–3(a), and held that the employer had a legitimate reason for firing an employee whose opposition was excessive and disruptive. In so holding, the court stated, "[a]llowing an employee to invoke the protection of section 704(a) for conduct aimed at achieving purely ulterior objectives, or for conduct aimed at achieving even proper objectives through the use of improper means, could have an effect directly contrary to Congress's goal, by discouraging employers from hiring persons whom the Act is designed to protect." 545 F.2d at 231. Frankly, the First Circuit's reasoning makes no sense to this Court—why an employer would be reluctant to hire women and minorities because of a rule that requires it to continue the employment of an excessively strident opponent (who may or may not be a woman or minority person) of unlawful practices is beyond us. In any event, as we explain in the text, *infra*, we do not believe that protecting supervisors from sexual harassment will create any significant disincentive to the hiring or promotion of women. To the extent that it would create any disincentive at all, we will rely on the Human Rights Act's prohibition against sex discrimination in hiring and promotions to overcome it.

tives: (1) it can forego engaging her because she is a woman and a potential sexual harassment plaintiff and thereby suffer the loss implicit in hiring a possibly less qualified person while also exposing itself to clear liability for sex discrimination in hiring under the Human Rights Act; or (2) it can hire the woman and adopt appropriate measures to prevent and remedy sexual harassment in its workplace. We think it is clear what a rational employer would do and what the Human Rights Act requires.

### III.

### CONCLUSION

We reiterate that we express no opinion on the factual validity of the plaintiff's claims. Rather, we hold that substantial factual issues must be decided before her claims can be resolved. For the reasons stated above, the judgment of the Circuit Court of Berkeley County is reversed and this case is remanded with directions to proceed with the litigation on both of the plaintiff's claims.

Reversed and remanded with directions.