517 S.E.2d 473

**Tina R. RICHMOND, Appellee,**

**v.**

**James ELLENBOGEN, Appellant.**

**No. 25434.**

Supreme Court of Appeals of
West Virginia.

Submitted April 14, 1999.

Decided June 24, 1999.

John D. Wooton, Esq., Wooton Law Firm, Beckley, West Virginia, Attorney for Appellant.

Karen B. Kostol, Esq., Beckley, West Virginia, Attorney for Appellee.

Darrell V. McGraw, Jr., Attorney General, Janie O'Neal Peyton, Assistant Attorney General, Attorney for Amicus Curiae West Virginia Human Rights Commission.

PER CURIAM:

Appellant James Ellenbogen appeals from the January 21, 1998, order of the Circuit Court of Raleigh County denying post-trial motions that he filed following an adverse jury verdict in a sexual harassment/constructive discharge case. Appellant asserts error with regard to the sufficiency of the evidence

presented against him and the burden of proof instruction given by the trial court. After considering these averments in conjunction with a thorough review of the record, we find no error and accordingly, we affirm.

## I. Factual Background

Appellant owns a dry-cleaning establishment located in Beckley, West Virginia, known as Mountaineer Cleaners. On October 12, 1995, Appellee Tina Richmond began working for Appellant. Appellee alleged that after the first three weeks of her employment, Appellant began to make numerous unwelcome sexual comments, to engage in sexual touching, and to request sex from her. When she could no longer tolerate the situation, Appellee terminated her employment on March 2, 1996. During the period of her employment, Appellee was living in an apartment owned by Appellant.[1]

Appellee filed a complaint in circuit court on October 11, 1996, alleging claims predicated on theories of intentional infliction of emotional distress, assault, battery, outrageous conduct, sex discrimination, sexual harassment, and retaliatory discharge. The case was heard by a jury on December 9, 10, and 12, 1997 and the jury returned a verdict for Appellee for a total amount of $71, 225.00.[2] Following the verdict, Appellant filed motions seeking a judgment notwithstanding the verdict and a new trial. The circuit court denied his post-trial motions and Appellant now seeks relief from this Court.

## II. Standard of Review

We recently set forth the standard of review for judgments notwithstanding the verdict[3] in syllabus point one of *Dodrill v. Nationwide Mutual Insurance Co.*, 201 W.Va. 1, 491 S.E.2d 1 (1996):

"The standard of review recited in Syllabus Point 1 in *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994) and in Syllabus Point 1 in *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995), and their progeny, is clarified to read as follows: In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a denial of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant." Syllabus point 1, *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996).

201 W.Va. at 3, 491 S.E.2d at 3. The standard of review with regard to a trial court's decision on the issue of a new trial is abuse of discretion. *See* Syl. Pt. 3, *In re State Public*

1. The landlord/tenant relationship resulted when Appellant learned that Appellee needed a place to live and he offered rental property for her use. No lease agreement was ever signed and the specific terms of the rental arrangement were never made known to Appellee. Despite pressing Appellant to give her a sum certain that she owed for rent, Appellee testified that he would not provide a figure. Whenever she asked Appellant about the rent, he would respond, "As long as you're working for me, don't worry about it," or "As long as you're working for me, we're not going to discuss it."

Appellee would calculate what she thought she owed Appellant and write out monthly rental checks, but Appellant refused to cash the checks. Since Appellee was always paid the same amount ($200 per week) no matter how many hours she worked in excess of the initially agreed upon

forty-hour work week (typically, she worked 44 to 48 hours), she figured that Appellant was withholding the additional compensation owed her for rent purposes. Only when Appellee finally left Appellant's employ did Appellant cash the final rent check that Appellee wrote to him.

2. The jury verdict included $1,225 for lost wages; $40,000 for emotional distress, annoyance and inconvenience, humiliation and degradation; and $30,000 in punitive damages.

3. We recognize that with the 1998 amendments to Rule 50 of the West Virginia Rules of Civil Procedure, a judgment notwithstanding a verdict is now referred to as a judgment as a matter of law.

*Bldg. Asbestos Litigation*, 193 W.Va. 119, 454 S.E.2d 413 (1994).

## III. Discussion

 We begin with Appellant's assignment that the evidence presented at trial was insufficient as a matter of law. We explained in syllabus point six of *Maples v. West Virginia Department of Commerce*, 197 W.Va. 318, 475 S.E.2d 410 (1996), that

> " 'In determining whether there is sufficient evidence to support a jury verdict, the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.' Syl. Pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984)." Syllabus point 3, *Realcorp, Inc. v. Gillespie*, 193 W.Va. 99, 454 S.E.2d 393 (1994) (per curiam).

We review the evidence presented at trial against this standard.

Appellee testified to numerous instances of uninvited and unwelcome conduct of a sexual nature that she experienced during her brief employment at Mountaineer Cleaners. Examples of the harassing conduct that Appellee endured included Appellant's constant offer to accompany her to the bathroom to "help ... [her] pull up and down ... [her] pants." On one occasion he even remarked that Appellee "didn't need toilet paper because he would dry ... [her] off with his tongue." When she declined his offer, Appellant responded, "That's okay. I have a camera up there." Based on Appellant's repeated comments regarding the placement of a camera in the bathroom, Appellee completely stopped using the bathroom while at work.[4] Before she ceased using the bathroom, however, Appellant added insult to injury by blocking her path to return to her work area[5] by "put[ting] one hand against the wall and one hand on the rail and tell[ing] ... her that ... [she'd] have to give him a kiss if ... [she] wanted to come downstairs." On one such occasion, Appellee "pushed him away ... and he twisted ... [her] arm and told ... [her] not to ever push him away again."[6]

Appellee testified that she was forced to endure unwelcome physical contact from Appellant on almost a daily basis. When the telephone rang and Appellee answered it, Appellant would "take his hands and rub ... [her] face" and tell her that she "had beautiful skin." Despite her repeated directives to stop, to which his response was laughter, Appellant continued this conduct. In addition to stroking her face, Appellant would rub Appellee's leg area, from her ankle to her knee while she was sitting at the press. She would ask him to stop, which he might do momentarily, and then he would quickly resume the same type of physically invasive contact. Appellee's only recourse was to get up and leave the room. Perhaps the most egregious instance of harassing physical conduct was when Appellant came up behind Appellee while she was steaming a shirt at the press, and "rubbed his genital area against ... [her] backside, causing ... [her] to fall forward and burn ... [her] left arm."[7] Appellee testified that following Appellant's inappropriate comment about how her jeans fit,[8] she began wearing long sweaters and

---

4. She testified that she was so convinced of the existence of a camera in the bathroom that she "tore that bathroom apart" looking for the camera.

5. The bathroom was on the second floor and there was only one stairway that allowed an individual to go to the second floor.

6. It was after this incident that Appellee ceased using the bathroom facilities at Mountaineer Cleaners.

7. After this incident, which occurred on a Saturday, Appellee testified that she stopped working on Saturdays as she was afraid to be alone with Appellant. Apparently, she was the only employee who worked at the cleaners on those Saturdays.

8. Appellee testified that Appellant stated in front of several customers with regard to a pair of blue jeans she was wearing that "he could see every crack and that he would buy ... [her] seven

other clothing that did not reveal her figure.[9] In addition, Appellee testified that she had to repeatedly remove Appellant's hands from her hipbones.[10] Although Appellant would sometimes feign an explanation for his conduct to the effect that he "need[ed] to get by," oftentimes he just placed his hands on her body without any stated basis. Appellant also repeatedly smacked Appellee "on ... [her] legs and ... [her] butt" with rolled up shirts that needed pressing.

At Christmas, Appellee testified[11] that Appellant give her a wrapped present, which consisted of "a necklace, a black nightie and a frying pan."[12] Appellee stated that although she threw the presents down after opening them inside the cleaners, when she left work that day they were in her car.[13] During the last week of her employ at Mountaineer Cleaners, Appellant related a dream that he had had the night before to Appellee and while doing so, "[h]e was taking the back of his thumb and rubbing up and down on his zipper." On the very last day when Appellee was leaving for lunch, she inquired whether Appellant wanted her to "bring him something back." His answer was to inquire whether she "was going to make love to him when ... she c[a]me back." When she responded in a negative fashion, Appellant said, "Well, then don't come back." Appellee testified that she then requested the wages owed to her and that she was paid before she left the cleaners.

Although Appellant contends that Appellee offered absolutely no corroborative evidence,[14] the record reveals that at least three witnesses testified to various aspects of Appellee's account of the facts. Robin Trent, a female friend with whom Appellee had previously worked at Revco Drug Store for a four-year period, testified both as to seeing the Christmas gifts that Appellant gave Appellee and to Appellee's fragile emotional state in response to her work situation. Ms. Trent testified that she either spoke with or saw Appellee on a daily basis and Appellee often "cried" or had "headaches" over her employment conditions. Ms. Trent also testified to having endured similar unwanted physical touching from Appellant when she worked at Mountaineer Cleaners for a brief period.[15] Another witness, Mark Ford, a Beckley City Police Department employee, testified that Appellee spoke with him in a personal capacity about the problems she was having with Appellant. He also testified as to seeing her in an emotional state on various occasions when he went into the cleaners to pick up his laundry.[16] He further testified to observing a check that was written by Appellee and made payable to Appellant in the approximate amount of $225, which was posted on a bulletin board inside the cleaners. Mr.

---

pairs of jeans if ... [she] would wear them every day to work."

9. Appellant's own witness, Gabrielle Elmore, corroborated that Appellee often wore long, loose-fitting sweaters.

10. Appellee testified that Appellant would put his hands on her hips on a daily basis, as many as six to ten times each day.

11. While at trial Appellant only admitted to giving Appellee the frying pan, an employee of the state unemployment compensation division, Leora Lilly, testified at trial that Appellant admitted to giving Appellee both the necklace and the frying pan, during a hearing held in connection with Appellee's application for unemployment benefits.

12. According to Appellee, Appellant stated that "he wanted ... [her] to wear the nightgown and the necklace when ... [she] was fixing him dinner with the frying pan."

13. All three of these items were introduced as exhibits at trial. A friend and former co-worker,

Robin Trent, testified that she saw the Christmas presents the evening that Appellee came home with them.

14. Appellant wrongly argues that absent such evidence Appellee could not be successful with regard to her sexual harassment claim. *See Gino's Pizza v. West Virginia Human Rights Comm'n*, 187 W.Va. 312, 418 S.E.2d 758 (1992) (holding that sexual harassment can be proven without corroborating testimony).

15. Appellant reportedly told Ms. Trent not to come back to work when she asked for time off to go on a trip with a male customer. Ms. Trent testified that she had reproached several advances for dates from Appellant, as well as his unwelcome touching.

16. Mr. Ford testified specifically that "generally, she would appear upset. Sometimes she would appear to have been weeping. Sometimes she would appear angry."

Ford's testimony thus supported Appellee's claim that she had written checks to Appellant in payment of the rent, which he refused to cash. Leora Lilly, an employee with the West Virginia Unemployment Compensation Division testified that Appellant admitted to giving Appellee both a necklace and a frying pan. She also testified that Appellant made no complaints about Appellee with reference to his employment of her, and that he had in fact requested that Appellee return to work for him.

Appellant's defense to Appellee's allegations was essentially that the lawsuit amounted to nothing more than a swearing contest and that Appellee was lying.[17] Appellant testified additionally that Appellee was a bad employee who fell asleep on the job and stole from him.[18] Appellee, in closing argument, pointed out several discrepancies with Appellant's version of the facts. First and foremost, Appellant admitted to contacting Appellee after she had left his employ and asking her to come back to work for him.[19] If Appellee had been the poor employee and thief, as Appellant had testified at trial, the obvious question, which Appellee called to the jury's attention, is why an admittedly astute business person would even consider rehiring someone like Appellee.[20] Second, Appellee argued that Appellant's testimony that Appellee just quit without any reason whatsoever completely defies logic in light of Appellee's dire need of a job and income.[21] Appellee had testified that she was divorced and the sole individual responsible for her then three-year-old son, who had numerous medical problems requiring treatment.[22] Third, the testimony concerning the lack of a rental agreement,[23] arguably supports Appellee's version of the facts, rather than Appellant's rendition. Whereas Appellant testified that he gave Appellee a place to live out of humanitarian concern for her situation,[24] if indeed that was his motivation, why then would he have disconnected the utilities, without giving her any notice of his intention to do so, shortly after she left his employ.[25] Appellee contended that this action supported her suggestion that Appellant had a quid pro quo arrangement in mind when he refused to enter into a specific rental arrangement with her.[26]

17. He also offered, apparently as a defense, the fact that he was old enough to be Appellee's father and he further suggested that, because he was allegedly impotent and therefore could not carry out the sexual act, he was not legally capable of sexual harassment.

18. Appellant claimed that Appellee took $20 out of the cash register on the day she left to pay Gabrielle Elmore, an individual who did alteration work for Appellant's customers, for money owed for alterations. Appellant admitted at trial, however, that he never indicated this occurrence to the Unemployment Compensation Division of the West Virginia Bureau of Employment Programs. When questioned at trial regarding this omission, his stated response was, "[w]ell, it was only $20."

19. Not only did Appellant contact Appellee orally, he made her a written offer of employment that was dated March 30, 1996.

20. Appellee argued to the jury, "If she was that bad of an employee, no rational businessperson would have asked her to come back."

21. Appellee's need of a job was so critical that on the very day she quit, she telephoned Appellant within a matter of hours and stated that she "would come back to work, if he would just stop

touching me." Appellee testified that Appellant "hung up" in response to her request.

22. Appellee testified that her son required daily treatments for his asthmatic condition and that he was on a heart monitor as well. The jury heard testimony by Appellee that, without notice, Appellant had her electricity and water turned off when she left his employ and that the lack of electricity prevented her from giving her son some of his required breathing treatments. Appellee testified that she was in the middle of administering one of the daily breathing treatments when the power went off.

23. *See supra* note 1.

24. He testified that he agreed to let Appellee live in his rental property rent-free and that she only had to pay for the utilities. The only stated benefit to Appellant from this arrangement was that his previously unoccupied rental property would now have a tenant and this would possibly prevent vandalism. The record indicates that the utilities remained in Appellant's name until after Appellant had them turned off and Appellee had to put down deposits to get them turned back on.

25. *See supra* note 22.

26. Appellee testified that on one occasion Appellant entered her rental home without notice or invitation at 10:30 p.m. and that she had addi-

After reviewing the record in this matter, we are left with the firm resolve that the jury was provided with sufficient evidence from which they could have reached a conclusion that Appellant had indeed committed sexual harassment. Giving Appellee the benefit of the doubt, as we are required to do, and considering all the favorable inferences, which the evidence presented as to Appellee, we conclude that the jury could have reasonably determined based on the evidence they heard that Appellee, and not Appellant, was the one telling the truth. Accordingly, we find no error with regard to Appellant's insufficiency of the evidence assignment.

■ Appellant asserts error with regard to the standard of proof applied by the trial court. Rather than the preponderance of the evidence standard, Appellant argues that the trial court should have used a clear and convincing standard. Notwithstanding the fact that the standard of evidence required for the claims brought by Appellee is indeed a preponderance of the evidence,[27] Appellant, as Appellee observes, even requested the insertion of the terms "preponderance of the evidence" in plaintiff's instruction number 1 and the trial court so modified the instruction.[28]

■ This Court stated in syllabus point one of *Muzelak v. King Chevrolet, Inc.*, 179 W.Va. 340, 368 S.E.2d 710 (1988), " 'Where an objection is made to an instruction for the first time on appeal and such instruction is not so deficient so as to require invocation of the "plain error" rule, in consonance with Rule 51, W.Va.R.C.P., this Court will not consider the late objection.' Syl. Pt. 1, *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974)." Because we find Appellant failed to object to the remaining instructional errors about which he now complains, we find that he has expressly waived such error since none of the alleged errors invite review under the "plain error" doctrine. *See Muzelak*,

179 W.Va. at 341, 368 S.E.2d at 711, syl. pt. 1. Accordingly, we find no error as to Appellant's assignment with regard to the burden of proof applied by the trial court or as to any further instructional error.

Based on the foregoing, the decision of the Circuit Court of Raleigh County is hereby affirmed.

Affirmed.

Justice McGRAW, deeming himself disqualified, did not participate in the decision of this case.

---

tional locks installed to prevent a reoccurrence. Appellant denied doing this, and testified that he only entered the rental premises for the express purpose of making necessary and requested repairs.

27. *See Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995); *Slack v. Kanawha County Hous. and Redevelopment Auth.*, 188 W.Va. 144, 423 S.E.2d 547 (1992); *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986).

28. Appellant stated: "Judge, . . . I think we need to put the language in these instructions that they must find a verdict by a preponderance of the evidence."