503 S.E.2d 6

**WEST VIRGINIA HUMAN RIGHTS COMMISSION, on its own behalf and on behalf of Caprice A. Stephen, Appellant,**

**v.**

**WILSON ESTATES, INC., A West Virginia Corporation, and Brian K. Wilson, Appellees.**

**No. 24142.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 20, 1998.

Decided May 18, 1998.

Concurring Opinion of Justice McCuskey June 1, 1998.

Darrell V. McGraw, Jr., Attorney General, Mary Blain McLaughlin, Assistant Attorney General, Charleston, for Appellant.

Stephen R. Brooks, Furbee, Amos, Webb & Critchfield, Fairmont, for Appellees.

WORKMAN, Justice:

The West Virginia Human Rights Commission ("Commission")[1] appeals from an order of the Circuit Court of Marion County dated October 18, 1996, granting summary judgment to Appellees, Wilson Estates, Inc., and Brian K. Wilson, in a housing discrimination action brought under the West Virginia Fair Housing Act (hereinafter sometimes referred to as the "Act"), West Virginia Code §§ 5-11A-1 to -20 (1994). Without stating any basis for its ruling, the lower court concluded that there was no genuine issue of material fact and that Appellees had not, as a matter of law, committed housing discrimination.[2] The Commission argues that the summary judgment award was improper as sufficient evidence of discrimination was present to permit this matter to proceed to trial. Upon a review of the record and applicable law, we determine that the lower court erred in granting summary judgment and accordingly, we reverse and remand for further proceedings.

## I. FACTS

On August 22, 1991, Wilson Estates entered into a one-year lease agreement with Caprice A. Stephen, a Caucasian, to rent an apartment located at 720 1/2 Pike Street, Barrackville, West Virginia. Ms. Stephens moved into the apartment on August 23, 1991, and the following day, Brian K. Wilson as the President of Wilson Estates, asked Ms. Stephen to vacate her apartment. The record suggests that Mr. Wilson's request was motivated by the fact that Ms. Stephen had moved into the apartment with the assis-

---

1. While the alleged discriminatee, Ms. Stephen, was the complainant before the Commission, under the provisions of the West Virginia Fair Housing Act, W.Va.Code §§ 5-11A-1 to -20 (1994), when a party elects to proceed in circuit court rather than before an administrative law judge selected by the Commission, the Commission is the entity responsible for filing an action in circuit court. See W.Va.Code § 5-11A-13(o)(1); see infra note 6.

2. The circuit court stated no separate reasons for its granting of Appellees' motion for summary judgment, choosing instead to rely on those bases asserted in Appellees' supporting memorandum. The only two grounds asserted in the memorandum were a statute of limitations issue and the inability of the Commission to establish that Ms. Stephen fell into a protected class entitling her to the protections of the Act. Since the record

indicates that the trial judge understood the law to proscribe discrimination based on the race of a tenant's companions, the lower court's summary judgment ruling does not appear to have turned on Appellees' argument that Ms. Stephen did not qualify for protection under the "race" classification. The circuit court appears to have been persuaded by both the statute of limitations argument and the fact that Ms. Stephen was permitted to live in the apartment for the duration of the rental period. The Commission points out in its petition, however, that the circuit court wrongly concluded that the lease expired after one year. The Commission's position is apparently based on the lack of a specific termination date in the assisted lease agreement signed by Mr. Wilson and Ms. Stephen on November 4, 1991, which provided that the Housing Authority of the City of Fairmont was responsible for Ms. Stephen's rent payments.

tance of her African American friends. Based on the fact that she had expended all her available funds in connection with the move and that she had no place to move to, Ms. Stephen refused to move. Mr. Wilson's next action was to notify the Housing Authority of the City of Fairmont ("Authority")[3] by letter dated October 7, 1991, that:

I will not be able to make the recommended repairs at 720 1/2 Pike Street, Barrackville, as per your letter dated October 1, 1991,

Therefore, I would appreciate the Caprice Stevens [sic] family vacating the apartment as soon as possible.

Ms. Stephen again chose not to vacate her apartment and Wilson Estates signed both a housing voucher contract and an assisted lease agreement on November 4, 1991, which provided that the Authority was the responsible entity for Ms. Stephen's monthly rent payments of $208.[4]

On July 21, 1992, Wilson Estates notified Ms. Stephen that she was to vacate her apartment at the expiration of her lease on August 22, 1992. Ms. Stephen refused to vacate the apartment at the stated time. On August 31, 1992, Wilson Estates instituted an action for wrongful occupation of residential rental property in magistrate court to force an eviction of Ms. Stephen. Magistrate Twyman dismissed the eviction proceeding.[5] Wilson Estates notified Ms. Stephen on September 12, 1992, that she was to vacate her apartment on November 4, 1992. Ms. Stephen complied with this notice by timely vacating the apartment on the specified date.

On November 3, 1993, Ms. Stephen filed a complaint with the Commission, alleging that Wilson Estates had discriminated against her on the basis of race and marital status. The Commission issued a probable cause finding on October 21, 1994, with regard to Ms. Stephen's complaint. Pursuant to West Virginia Code § 5–11A–13(a),[6] Appellees elected to have the action heard by the Circuit Court of Marion County.[7]

Following extensive discovery, Appellees moved for summary judgment on the grounds that Ms. Stephen was not a member of a protected class subject to the Act's protections. Specifically, Appellees asserted that she could not prove discrimination based on race as the allegation of racial discrimination stemmed from the race of Ms. Stephen's African American friends and not her own race. In addition, Appellees argued that Ms. Stephen could not demonstrate discrimination predicated on her marital status based on the fact that Mr. Wilson rented the apartment to her with full knowledge of her single motherhood status. The circuit court heard oral argument on the motion on September 9, 1996, and then ruled in favor of Appellees, finding that there was no genuine issue of material fact and that Appellees were entitled to judgment as a matter of law.

On September 27, 1996, the Commission filed a motion for reconsideration of the court's ruling on the grounds that it had not

---

3. The October 7, 1991, letter indicates that Ms. Stephen was to receive a copy of this letter.

4. While the circuit court viewed Mr. Wilson's execution of the housing voucher contract and the assisted lease agreement as evidence that he was no longer discriminating against Ms. Stephen, the record is clear that Mr. Wilson viewed the initial contract he entered into with Ms. Stephen on August 22, 1991, as a binding agreement which prevented him from forcing her to vacate the premises during the lease's duration. The signing of the housing voucher contract reflects Mr. Wilson's desire to be assured of receiving the monthly rent payment, but *not* a relinquishment of his opinion that Ms. Stephen was "not compatible to the neighborhood." Indeed, Mr. Wilson's actions with regard to initiating a wrongful occupation complaint in magistrate court prior to the lease's expiration suggest that Mr. Wilson continued to be intent upon removing Ms. Stephen from his apartment.

5. Appellees assert that Magistrate Twyman determined that Ms. Stephen's lease did not expire until one year from the date of the contract authorizing subsidization of Ms. Stephen's rent—November 4, 1991. The Commission represents that Ms. Twyman determined only that Ms. Stephen had not broken the terms of the lease and accordingly, there was no basis for Appellees' wrongful occupation petition.

6. Any party has the option to elect to have a proceeding brought under the Act heard in circuit court in lieu of a hearing before an administrative law judge selected by the Commission. *See* W.Va.Code § 5–11A–13(a), (b).

7. The circuit court proceeding was initiated on December 14, 1994, with the filing of a complaint by the Commission on its own behalf and on Ms. Stephen's behalf.

received adequate notice of the motion for summary judgment and consequently had been precluded from presenting evidence in opposition to such motion.[8] In response to the Commission's motion, a second hearing on the motion for summary judgment was held on October 9, 1996.[9] At the conclusion of this hearing, the circuit court again ruled in Appellees' favor. The Commission appeals from the lower court's summary judgment ruling.

## II. STANDARD OF REVIEW

 Our standard of review for summary judgment rulings, as we stated in syllabus point one of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), is "*de novo.*" It is axiomatic that " ' "[a] motion for summary judgment· should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992)." Syl. Pt. 2, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). We articulated the standard for granting summary

8. Although the record clearly reflects the Commission's objections to the scheduling of the hearing on September 9, 1996, the circuit court proceeded to hold the hearing on that date. The Commission objected to being served with the motion on September 6, 1996, along with a notice of hearing on the motion scheduled for September 9, 1996, citing the requirement of Rule 56 of the West Virginia Rules of Civil Procedure that a summary judgment motion must be served on the respective parties at least 10 days before a hearing on the motion takes place. The record further reflects that despite the Commission's willingness to participate in the summary judgment hearing by telephonic means, if necessary, the circuit court advised the Commission at 12:00 p.m. on September 9, 1996, that all counsel were to be present in person at the 2:00 p.m. hearing scheduled for that date. Despite a communication to the circuit court that counsel representing the Commission was en route to Clarksburg for the hearing and would be there between 2:00 and 2:30 p.m., the court held the hearing at 2:07 p.m. without the Commission's counsel and ruled in favor of Appellees on their motion for summary judgment after only eight minutes.

At the beginning of the hearing on their motion for summary judgment, Appellees stated on the record that all dispositive motions were to be filed 15 days before the trial date pursuant to the agreed pre-trial order. Since trial was scheduled for September 19th, Appellees calculated September 4th as the date on which their summary judgment motion had to be filed and acted accordingly. Appellees further pointed out to the circuit court that September 9th at 2:00 p.m. was a date and time that originally had been reserved by the Commission for pretrial motions. This Court fully recognizes the validity of a lower court's time frame order with regard to Appellees' argument that they were required to file their summary judgment motion on September 4, 1996. The obligation to file a summary judgment motion on such date, however, did not require that the *hearing* be held prior to the ten-day period set forth in Rule 56.

9. A review of the transcript from this proceeding indicates that while the circuit court did ostensibly permit the Commission to revisit the issue of the summary judgment ruling, the lower court's comments to the Commission's attorney indicate that the hearing was *pro forma* only and that the court did *not* give serious consideration to the Commission's valid arguments. Proof of this is demonstrated by the fact that the Commission eviscerated Appellees' statute of limitations claim, both by correctly pointing out the fact that Ms. Stephen had timely filed her complaint with the Commission and by informing the lower court of the decision of this Court in *West Virginia Human Rights Commission v. Garretson*, 196 W.Va. 118, 468 S.E.2d 733 (1996), that any delay by the Commission in removing a housing discrimination complaint to circuit court will not be held against a complainant who has timely filed her complaint with the Commission. In spite of this edification, the lower court refused to reconsider its ruling on the statute of limitations issue.

In reviewing the transcript from the hearing on the Commission's motion for reconsideration we must remonstrate the circuit court for its treatment of the Commission's counsel. When counsel was attempting to make her initial statement to the lower court, the court interrupted her and told her that it was not going to listen to her read to the court and that she could "submit a written brief" and that "[i]f you don't like this format, you know, you make take an appeal." Then, when the Commission asked "May I go through the prima facie elements of a housing discrimination case and evidence in this case?" the lower court responded, "I don't think so, counsel." The fact that the circuit court specifically prevented the Commission from presenting argument on this crucial aspect of the case is especially critical as the Commission was arguing that Appellees had wrongly relied on the prima facie elements of an employment discrimination case, rather than on those elements applicable to a housing discrimination case.

judgment motions in syllabus point four of *Painter:*

> Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

192 W.Va. at 190, 451 S.E.2d at 756.

## III. DISCUSSION

### A. Prima Facie Proof of Discrimination

Our review of this matter necessarily begins with the statute under which Ms. Stephen sought relief. Through her complaint, Ms. Stephen alleged that Appellees had violated subsection five of the West Virginia Fair Housing Act, which specifically addresses discrimination in the context of housing rental or sale:

> [I]t shall be unlawful:
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, ancestry, sex, familial status, blindness, handicap or national origin;
>
> (b) To discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, ancestry, sex, familial status, blindness, handicap or national origin[.]

W.Va.Code § 5–11A–5(a), (b). The stated ground for discrimination in Ms. Stephen's original complaint was her association with African Americans. In her amended complaint, Ms. Stephens included her familial status—a single mother—and her gender as additional bases of discrimination.

During the course of a pre-trial conference, the Commission called the court's attention to evidence that Mr. Wilson was motivated to terminate Ms. Stephen's tenancy based on her association with African Americans. That evidence included the following excerpt from Ms. Stephen's deposition concerning Mr. Wilson's initial request that she vacate the apartment on August 24, 1991.

> Q. Now we were talking about the phone call you got from Mr. Wilson. Tell me, in as much detail as you can recall, what he said to you and what you said to him? This was on August 24th?
>
> A. Yes. I answered the phone. He told me I was going to have to move out. I asked him why. He said, "I just don't want to rent to someone like you." . . . And I asked him why. I said, "I haven't done anything." He said, "Because I don't like the looks of your friends; and the neighbors have been saying things, also."
>
> . . . .
>
> Q. What else do you recall about that conversation?
>
> A. I kept asking him what he meant by he didn't like the looks of my friends. And he kept saying, "You know what I mean. Don't make me say it. I just want you to move out."

Additional evidence adduced on the issue of Mr. Wilson's motivation was the fact that Mr. Wilson had never rented to an African American. The pre-trial order submitted by the parties set forth the following on the issue of Appellees' motivation and intent:

> Janet Hope Wilson, vice president, secretary, stockholder, director of Wilson Estates, and wife to Brian Wilson, had evicted another unmarried white female tenant, Nancy Edwards, for having mixed race guests in and out of the apartment she and Brian Wilson owned. The night before Nancy Edwards was evicted, she had two black men to a card party with her other friends. These . . . same two black men . . . helped Caprice Stephen move into 720 1/2 Pike Street.

The issue of Ms. Stephen's familial status as a single mother was also presented as a basis for the alleged discriminatory conduct of Appellees. In her complaint filed with the Commission, Ms. Stephen alleged that Mr. Wilson "stated he assumed I planned to be married and preferred not to rent to single females." Ms. Stephen testified in her deposition that in January 1992 Mr. Wilson knocked on her apartment door and inquired as to whether she had found another place to

live. When she said that she intended to remain in the apartment for the duration of the lease period, Mr. Wilson said, "Well, why haven't you gotten married yet?"

Appellees argued that Ms. Stephen could not demonstrate a violation of the Act as she was not a member of a protected class subject to the Act's protections. Their position is two-fold. First, that as a Caucasian, she cannot rely on the protected class designation of race. The argument here is that even if Appellees discriminated against Ms. Stephen based on the race of her friends, it is her race only that determines whether she is entitled to seek recovery under the Act. Second, Appellees argue that because Ms. Stephen's familial status as a single mother was known to Mr. Wilson at the time he entered into the original lease agreement, *ipso facto* he could not have discriminated against her on the basis of her status as an unmarried mother.

■ We first examine the premise asserted by Appellees that discrimination cannot occur under the Act from a person's association with a member of a protected class. This Court has consistently looked to federal discrimination law dealing with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to e–17 (1994) when interpreting provisions of our state's human rights statutes. *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 482, 457 S.E.2d 152, 159 (1995) (noting that "cases brought under the West Virginia Human Rights Act are governed by the same analytical framework and structures developed under Title VII, at least where our statute's language does not direct otherwise"); *West Virginia University v. Decker,* 191 W.Va. 567, 573–74, 447 S.E.2d 259, 265–66 (1994) (altering disparate impact test previously established based on 1991 amendments to Title VII which shifted burden of production and persuasion to employer to prove that particular employment practice or policy is "job related" and "consistent with business necessity"); *Slack v. Kanawha County Housing and Redevelopment Auth.,* 188 W.Va. 144, 153–55, 423 S.E.2d 547, 556–558 (1992) (defining elements of constructive discharge cases by adopting majority view of federal decisions decided under both Title VII and Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*); *Frank's Shoe Store v. Human Rights Commission,* 179 W.Va. 53, 58–59, 365 S.E.2d 251, 256–57 (1986) (citing Pregnancy Discrimination Act amendment to Title VII and United States Supreme Court decision interpreting that amendment as basis for holding that discrimination based upon pregnancy constitutes illegal sex discrimination under West Virginia Human Rights Act); *see also Paxton v. Crabtree,* 184 W.Va. 237, 250, 400 S.E.2d 245, 258 n. 26 (1990) (observing that "we have adopted federal precedent when we believed it was compatible with our human rights statute").

Just as Title VII is the federal analogue to our Human Rights Act, the Federal Fair Housing Act, 42 U.S.C. § 3601–3631 (1994) is the precedent federal act that served as the genesis of our state fair housing act. *See* W.Va.Code § 5–11A–1 to –20. Based on this Court's longstanding practice of applying the same analytical framework used by the federal courts when deciding cases arising under the Human Rights Act, decisions involving the Federal Fair Housing Act are equally valid precedent provided that the statutory language under consideration is similar. *Cf. Barefoot,* 193 W.Va. at 483, 457 S.E.2d at 160 n. 9 (noting that where language of West Virginia Human Rights Act substantially differs from Title VII provisions, "we have inferred a State legislative intent to diverge from the federal law"). The provisions of the Act at issue here—West Virginia Code § 5–11A–5(a), (b)—are virtually identical to their federal counterparts stated in 42 U.S.C. § 3604(a), (b).[10] The only difference between

---

10. The federal fair housing act provides:
 [I]t shall be unlawful—
 (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
 (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of

the federal and state statutes under consideration is that our state statute contains three additional classifications—ancestry, blindness, and handicap—none of which are applicable to this case. *See* note 10.

Under federal law, the issue *sub judice*—whether discrimination within the meaning of a fair housing act can occur when the tenant's race is Caucasian and the race of the tenant's associates is African American—is well-settled. In *Woods–Drake v. Lundy*, 667 F.2d 1198 (5th Cir.1982), the court considered whether whites who had been evicted following their entertainment of African American guests in their rented apartment had a cause of action under the federal fair housing act. *Id.* at 1199. The appellate court reversed the district court's entry of judgment in favor of the landlord, finding that a cause of action existed under both the housing act and under 42 U.S.C. § 1982.[11] 667 F.2d at 1204. The appellate court ruled that "[g]iven the district court's finding that defendant evicted plaintiffs because plaintiffs had black persons as guests, the conclusion of liability under Section 1982 and under the Fair Housing Act is inescapable." *Id.* at 1201. In holding that such conduct was prohibited by the Fair Housing Act, the *Lundy* court underscored the language of the 42 U.S.C. § 3604(b) that reads, " '[I]t shall be unlawful ... to discriminate against *any person* in the terms, conditions, or privileges of ... rental or a dwelling ... because of race ...' " 667 F.2d at 1201. Determinative to the *Lundy* court was the statutory language which unequivocally provides that *any per-*

> race, color, religion, sex, familial status, or national origin.
> 42 U.S.C. § 3604(a), (b).

**11.** That section provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. The *Lundy* court observed that a violation of 42 U.S.C. § 1981 ("full and equal benefit of all laws") also occurred, but focused on the language of Section 1982 because that statute "refers specifically to the use of real property." 667 F.2d at 1200, n. 3.

**12.** Although the language of the federal fair housing act makes clear that housing discrimination predicated on race can extend to *any person,*

*son* can be the recipient of race discrimination within the housing context—not just those individuals who themselves are members of a protected racial classification.[12] *Id.* In making its ruling, the court referenced the United States Supreme Court holding in *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), in which white tenants were found to have standing to sue under the Fair Housing Act for the loss of interracial association due to the apartment owner's racially discriminatory tenant selections. 667 F.2d at 1201–02; *see also United States v. L & H Land Corp.*, 407 F.Supp. 576, 579 (S.D.Fla. 1976) (recognizing that federal fair housing act "prohibits discrimination against white persons because of the race or color of their guests").

Like its federal counterpart, our Act seeks to encourage fair and equal housing opportunities for all peoples. We expounded in *West Virginia Human Rights Commission v. Garretson*, 196 W.Va. 118, 468 S.E.2d 733 (1996), that

> The West Virginia Fair Housing Act is worded as a broad legislative mandate to eliminate discrimination against, and equalize housing opportunities for, all races. The Act is a clear pronouncement of our State's commitment to end the exclusion of African–Americans from the American mainstream. Thus, the right to be free from housing discrimination is essential to the goal of an harmonious and unbiased society.

the United States Supreme Court has determined that discrimination predicated on the race of one's companions can also occur under the public accommodations provision of Title II. *See Adickes v. Kress & Co.*, 398 U.S. 144, 150 n. 5, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1969) (noting that store's refusal to serve white teacher at lunch counter based on her accompaniment by six African American students, while brought as a violation of 42 U.S.C. § 1983, was equally violative of the Public Accommodations provision of Title II, 42 U.S.C. § 2000a). The United States Supreme Court observed in *Adickes*, that "[f]ew principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way act to compel or encourage racial segregation." 398 U.S. at 151–52, 90 S.Ct. 1598.

196 W.Va. at 124, 468 S.E.2d at 739. Consistent with that goal and with the actual language of the Act, which specifically proscribes discriminatory treatment against *any person* based on race, we hold that under the West Virginia Fair Housing Act, a cause of action exists for discrimination directed against a tenant based on the race of those individuals with whom the tenant chooses to associate.

■ Appellees and the circuit court both misunderstood the fact that all a discrimination plaintiff need show is a prima facie case to survive a summary judgment ruling. We explained in syllabus point two of *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986), a case in which we set forth the prima facie elements for employment discrimination, that "[t]o successfully defend against a motion for summary judgment, the plaintiff must make some showing of fact which would support a prima facie case for his claim." Subsequently, in *Barefoot* we clarified that only an inference of discrimination was necessary to establish a prima facie case of discrimination necessary to survive a summary judgment ruling. 193 W.Va. at 484–85, 457 S.E.2d at 161–62. Addressing the fact that conflicting evidence on the ultimate issue of discrimination routinely is presented, we stated that "[t]his resulting conflict must be resolved by a jury and not by a circuit court as a matter of law." *Id.* at 488, 457 S.E.2d at 165. Unless the alleged discriminator "comes forward with evidence of a *dispositive,* nondiscriminatory reason as to which there is no real dispute and 'which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.'" *Barefoot,* 193 W.Va. at 487, 457 S.E.2d at 164 n. 19 (quoting *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2nd Cir.1995)).

■ The evidence presented in this case was that Mr. Wilson "didn't like the looks" of Ms. Stephen's African American friends.

There was evidence that Mr. Wilson, who had never rented to an African American person, began his efforts to force her out of his apartment the day after Ms. Stephen moved into the apartment with the help of her African American friends. According to other evidence, Mr. Wilson candidly told Ms. Stephen that she was "not compatible to the neighborhood" and when she asked why, he said, "[d]on't make me say it." After Mr. Wilson got Ms. Stephen to leave the apartment, he rented the apartment to a single, childless white male.[13] This evidence, when viewed in the light most favorable to the Commission, results in the conclusion that Ms. Stephen did in fact present an inference of discrimination sufficient to survive Appellees' summary judgment motion.

■ We explained in *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995), that "[c]ourts should take special care when considering summary judgment in employment and discrimination cases because state of mind, intent, and motives may be crucial elements." *Id.* at 61, 459 S.E.2d at 338. Summary judgment is often imprudent in discrimination cases that present issues of motive or intent because, as we recognized in *Williams,* " [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]' " *Id.* at 59, 459 S.E.2d at 336 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *accord Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir.1951) (holding that summary judgment should be denied "even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom"). In the instant case, the jury, rather than the trial court, should decide whether Appellees violated the Act by asking Ms. Stephen to move out of the apartment two days after she moved in, continuing to seek her removal through a wrongful occupation petition, by refusing to permit her to continue her tenancy, and by then permitting a single white male to rent the apartment.

---

**13.** Evidence was introduced that, whereas Ms. Stephen was told by Mr. Wilson that he would reimburse her for repairs she made to the apartment if she decided to move, other tenants were routinely reimbursed for repairs made to their apartments during their actual tenancy.

### B. Statute of Limitations

As an alternate basis for its summary judgment motion, Appellees asserted that the applicable statute of limitations had run before the action was filed in the circuit court. The essence of this argument is that the circuit court action was not timely filed because the Commission initiated the circuit court action on December 14, 1994, more than thirty days after Appellees elected on November 11, 1994, to proceed in circuit court. In syllabus point three of *Garretson* this Court held

Dismissal of a Fair Housing Act claim, which had been timely and properly filed with the Human Rights Commission, because of that agency's failure to timely remove the case to circuit court as provided in W.Va.Code 5–11A–13(*o*)(1) (1992), would deprive the complainant of his property interest in the right to redress of discrimination and. to a decision on the merits of his charge and would thus violate the Due Process Clause in Article III, § 10 of the West Virginia Constitution.

196 W.Va. at 121, 468 S.E.2d at 736. We determined in *Garretson* that West Virginia Code § 5–11A–13(*o*)(1) "is not a statute of limitations." 196 W.Va. at 122, 468 S.E.2d at 737. Instead, as we commented, the thirty-day time period set forth in that section is a "deadline for *removal.*" *Id.* at 122–23, 468 S.E.2d at 737–38 n. 3. In explanation of why the removal provision should not be applied "as a mandatory and jurisdictional requirement," we stated:

this case would present the paradigm example in which an innocent victim would be forced to suffer the dismissal of his lawsuit because the Commission failed to act properly. It is doubtful that such an anomalous result was contemplated by the Legislature that placed the fate of a victim of racial discrimination in the hands of the Commission.

196 W.Va. at 125, 127, 468 S.E.2d at 740, 742. We further observed that such a result would be "inconsistent with the spirit of the statute." 196 W.Va. at 127, 468 S.E.2d at 742.

14. West Virginia Code § 5–11A–11(a)(1)(A) states that "[a]n aggrieved person may, not later than one year after an alleged discriminatory housing

Appellees maintained that the last possible date for purposes of the Act's one-year statute of limitations was November 4, 1992—the date on which Ms. Stephen was required to vacate the apartment. Because she instigated her complaint with the Commission on November 3, 1993, Ms. Stephen met the statutory filing requirements imposed by West Virginia Code § 5–11A–11(a)(1)(A).[14] Under this Court's holding in *Garretson,* the Commission's failure to file a complaint in circuit court within the thirty-day period specified by West Virginia Code § 5–11A–13(*o*)(1) does not act as a bar to the instant housing discrimination suit as Ms. Stephen filed her initial complaint within one year of the events complained of in compliance with West Virginia Code § 5–11A–11(a)(1)(A) and because Appellees have failed to demonstrate prejudice. 196 W.Va. at 122, 468 S.E.2d at 737. Thus, the circuit court erred in its conclusion that·the Commission was time-barred from proceeding with Ms. Stephen's complaint.

Based on the foregoing, we hereby reverse the decision of the Circuit Court of Marion County and remand this matter for further proceedings. ·

Reversed and remanded.

MAYNARD and McCUSKEY, JJ., concur.

McCUSKEY, Justice, concurring:

(Filed June 1, 1998)

I concur with the majority's conclusion that our West Virginia Fair Housing Act makes association-based discrimination in housing unlawful. However, the majority arrived at their destination by following a twisted and dangerous shortcut rather than following the direct route clearly shown on the road map of West Virginia jurisprudence. I intend this concurrence to provide more concise directions for future travelers on this important legal route.

The statute involved in this case, *W.Va. Code* § 5–11A–5(a) (1992), provides it shall be unlawful:

practice has occurred or terminated, file a complaint with the commission alleging a discriminatory housing practice."

To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, ancestry, sex, familial status, blindness, handicap or national origin.

This is markedly different from the language of another West Virginia discrimination statute, *W.Va.Code* § 5–11–9(6)(A) (1992), the portion of the West Virginia Human Rights Act which deals with public accommodations. That statute provides:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

\* \* \*

(6) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodations to:

(A) Refuse, withhold from or deny to any individual because of *his* race, religion, color, national origin, ancestry, sex, age, blindness or handicap, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of such place of public accommodations. [Emphasis added.]

In comparing these two statutes, it is important to note that *W.Va.Code* § 5–11–9 makes it unlawful to discriminate against an individual because of "his" race, religion, etc., whereas *W.Va.Code* § 5–11A–5, does not include the word "his". Even the most inexperienced legal scholar would conclude that the Legislature's decision to include the word "his" in one anti-discrimination statute and exclude it in the other is much more than a hair-splitting distinction.

Other jurisdictions which have examined similar anti-discrimination statutes have held that the inclusion of a word which specifically indicates that an individual is discriminated against because of "his" race, rather than race generally, is critically important in determining whether the statute proscribes only direct discrimination or whether it also proscribes association-based discrimination.

When the word "his" is included, other jurisdictions have held that association-based discrimination is not actionable. When it is not included, association-based discrimination is proscribed. *See Buffi v. Ferri*, 106 R.I. 349, 259 A.2d 847 (1970), and *McGill v. 830 S. Michigan Hotel*, 68 Ill.App.2d 351, 216 N.E.2d 273 (1966).

Using this more concise analysis, the majority would still easily have reached the ultimate decision which it did reach in the present case, that is, that association-based discrimination in housing is unlawful.

Instead of using this approach, the majority, as reflected in footnote 12, indicates that our body of discrimination law implicitly contains an inherent basis for holding that association-based discrimination is unlawful. The cases which I have cited above suggest that there is nothing of this sort inherent in discrimination law generally, and I cannot see how it is magically inherent in our law. Discrimination is made unlawful by statute, not by common law, and, thus, our discrimination statutes are in derogation of our common law. In ignoring the specific language of our statutes, and in finding an inherent basis for proscribing association-based discrimination, the majority has turned its back on the long-standing principle that statutes in derogation of the common law should be strictly construed. *Rhodes v. J.B.B. Coal Co.*, 79 W.Va. 71, 90 S.E. 796 (1916).

I am also disturbed by the deference that the majority has given to federal statutes and federal decisions when, in the case before us, no federal statute is involved and no federal precedent is controlling. While I believe that federal decisions can often be helpful in providing guidance in analyzing our law, the fundamental basis of much of federal discrimination law is distinct from the fundamental basis of our state law. As pointed out in *Ranger Fuel Corporation v. Human Rights Commission*, 180 W.Va. 260, 376 S.E.2d 154 (1988), West Virginia's law, when properly construed and applied, can actually afford more protection to individuals in protected classes. Here, the majority, which was aware of the cases which I have cited above, has unconsciously usurped the Legislature's power to proscribe association-based discrimination generally. What our Legislature actually said, and the cases which I have

cited, do not support such a broad proscription. The majority therefore, has chosen federal enactments, which are worded differently from our law, and federal decisions based on those enactments, to serve as the basis of their decision.

Those who know me know that I disapprove of discrimination, and I want to reiterate that I concur with the result reached by the majority. However, I believe that this Court is setting a dangerous precedent by conjuring up an "inherent" basis for the decision in this case. It is dangerous to blindly use federal statutes and decisions as controlling authority in discrimination cases brought under our state's statutes.

I am authorized to state that Justice MAYNARD joins in this concurring opinion.