IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 13-1084

_____

**FILED**
**June 10, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC,
AND MELVIN LAGER,
Defendants Below, Petitioners

v.

SHARON GRIFFITH AND LOU ANN WALL,
Plaintiffs Below, Respondents

_____

Appeal from the Circuit Court of Jackson County
Honorable Thomas C. Evans, III, Judge
Civil Action No. 11-C-26

AFFIRMED, IN PART, AND REVERSED, IN PART
_____

Submitted: April 7, 2015
Filed: June 10, 2015

Ancil G. Ramey, Esq.
Christopher Slaughter, Esq.
Steptoe & Johnson, PLLC
Huntington, West Virginia
Attorneys for Petitioners

W. Henry Jernigan, Jr., Esq.
Jill Cranston Rice, Esq.
Andrew T. Kirkner, Esq.
Dinsmore & Shohl, LLP
Charleston, West Virginia

Walt Auvil, Esq.
Michele Rusen, Esq.
Rusen & Auvil, PLLC
Parkersburg, West Virginia
Attorneys for Respondents

Attorneys for Amicus Curiae
West Virginia Chamber of Commerce

Lonnie C. Simmons, Esq.
DiTrapano, Barrett, DiPiero, McGinley &
Simmons, PLLC
Charleston, West Virginia
Attorney for Amici Curiae
West Virginia Foundation for Rape and
Information Services, American Civil
Liberties Union of West Virginia
Foundation, West Virginia Employment
Lawyers Association, WV Free, and West
Virginia Association for Justice

JUSTICE BENJAMIN delivered the Opinion of the Court.

JUSTICE DAVIS and JUSTICE WORKMAN concur in part and dissent in part and reserve the right to file separate opinions.

JUSTICE KETCHUM AND JUSTICE LOUGHRY concur in part and dissent in part and reserve the right to file separate opinions.

SYLLABUS BY THE COURT

1.      "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

2.      "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence."  Syl. pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976).

3.      "When reviewing an award of punitive damages in accordance with Syllabus point 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), and Syllabus point 5 of *Alkire v. First National Bank of Parsons*, 197 W. Va. 122, 475 S.E.2d 122 (1996), this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award." Syl. pt. 16, *Peters v. Rivers Edge Min., Inc.*, 224 W. Va. 160, 680 S.E.2d 791 (2009).

4.      "The West Virginia Human Rights Act, W. Va. Code 5-11-9(1) (1992), imposes a duty on employers to ensure that workplaces are free of sexual

harassment from whatever source." Syl. pt. 8, *Hanlon v. Chambers*, 195 W. Va. 99, 464 S.E.2d 741 (1995).

5.     "An employee may state a claim for hostile environment sexual harassment if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature have the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment." Syl. pt. 7, *Hanlon v. Chambers*, 195 W. Va. 99, 464 S.E.2d 741 (1995).

6.     "To establish a claim for sexual harassment under the West Virginia Human Rights Act, W. Va. Code, 5-11-1, *et seq.*, based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Syl. pt. 5, *Hanlon v. Chambers*, 195 W. Va. 99, 464 S.E.2d 741 (1995).

7.     "In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence

tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Syl. pt. 5, *Orr v. Crowder*, 173 W. Va. 335, 315 S.E.2d 593 (1983).

8. "When this Court, or a trial court, reviews an award of punitive damages, the court must first evaluate whether the conduct of the defendant toward the plaintiff entitled the plaintiff to a punitive damage award under *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895), and its progeny. If a punitive damage award was justified, the court must then examine the amount of the award pursuant to the aggravating and mitigating criteria set out in *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992)[, *aff'd*, 509 U.S. 443, (1993)]." Syl. pt. 6, *Perrine v. E.I. Du Pont De Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

9. "In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous." Syl. pt. 4, *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895).

Benjamin, Justice:

Petitioners, Constellium Rolled Products Ravenswood, LLC ("Constellium" or "the company") and Melvin Lager (hereinafter "CEO Lager" or "the CEO") appealed the September 3, 2013, final order of the Circuit Court of Jackson County. In its order, the circuit court denied Constellium's post-trial motion for judgment as a matter of law or for a new trial following a jury trial. The jury awarded respondents Sharon Griffith and Lou Ann Wall compensatory damages in the amount of $250,000 each and punitive damages in the amount of $250,000 each for their hostile work environment claims.

By a memorandum decision filed on October 17, 2014, this Court affirmed the circuit court's denial of the petitioners' post-trial motion. The petitioners subsequently filed a petition for rehearing. This Court granted the petition for rehearing and also permitted the parties to file supplemental briefs specifying the precise facts that support their positions on the issues of punitive damages and whether the petitioners' wrongful conduct was based upon the respondents' gender.

Based upon the parties' supplemental briefs and oral arguments, the designated appendix record, and the pertinent authorities, we affirm the circuit court's final order to the extent that it denied the petitioners' motion for judgment as a matter of

1

law or for a new trial on the issue of the award of compensatory damages.[1] However, we reverse the circuit court's order to the extent that it denied the petitioners' motion for judgment as a matter of law or for a new trial on the issue of the award of punitive damages.

## I. FACTS

Respondents Griffith and Wall are long-time employees of Petitioner Constellium which is located in Ravenswood, West Virginia. Petitioner Melvin Lager was the CEO of Constellium at the time of the events in this case. Ms. Griffith and Ms. Wall work in the Project Maintenance Department where they are the only two females among seventeen employees.

From September 2009 until February 2010, the company had a suggestion box into which employees could submit comment cards anonymously.[2] The company's policy was to post the comments from every comment card submitted after the cards were retyped and the names of individual employees redacted. Also posted with the comment

---

[1] This Court acknowledges the briefs of amici curiae. The West Virginia Chamber of Commerce filed a brief in support of the petitioners, and in support of the respondents the West Virginia Foundation for Rape and Information Services, American Civil Liberties Union of West Virginia Foundation, West Virginia Employment Lawyers Association, WV Free, and West Virginia Association for Justice filed a brief. This Court has considered the arguments of amici curiae in our decision herein.

[2] At trial, CEO Lager stated that the purpose of the comment cards was "to try to get the cooperation between the management, the leadership, the salary workforce, and the people working on the shop floor, to make sure everybody could come together to try to turn and save the business."

cards were the CEO's response to each comment. Specifically, the original hand-written comment cards, with redactions, were posted on a bulletin board beside the redacted, typed versions with the typed response of CEO Lager. The bulletin board was located at the entrances of the plant where the comments and responses could be read by all of Constellium's employees, contractors, and vendors coming into and leaving the plant. Evidence was adduced at trial below that in October 2009, approximately 43 employee comments with the corresponding CEO responses were posted on the bulletin board.

On or about October 12, 2009, a Constellium employee, Larry Keifer,[3] wrote three comment cards about Ms. Griffith and Ms. Wall which were subsequently posted on the bulletin board with the response of CEO Lager. These cards stated as follows:

> (1)      Ask _____ supervisor what he had his crew doing in Project Maintenance on Oct. 9[th] on evening shift! I understand Project has at least 3 extra buggies. One of their buggies was missing on that shift I understand. _____ (hourly employee) and another lady spent 4 hours hunting for that missing buggy. They (Project) had no supervision that evening; seems like lazy a____ like them don't need to be here especially on overtime looking for one of their extra buggies. They need to give up their extra buggies to Plate dept. maint. So they don't have to walk and carry their tools.
>
> CEO RESPONSE:
>      This doesn't seem to be the best use of time or equipment.

---

[3] The respondents initially named Mr. Keifer as a party to the lawsuit, but he was voluntarily dismissed during the underlying litigation.

(2)     Lazy a__ _____ (employee) was here on overtime again on Saturday, 9th doing "Nothing." Smoking cigarettes and drinking coffee again and sitting on her a__ in the lunchroom. This is b___ s___. And will be here on Sunday on double time 10th doing the same!

CEO RESPONSE:
        We need everyone fully engaged and productive.

(3)     _____ (employee) (Project Maint) comes in on weekends to work (overtime) time and a half on Saturdays and double time on Sundays and sits on her a__ both days in the lunchroom and does "Nothing." "This is b___ s___". I'm tired of carrying her big lazy a__ around. This is not fair to the company or the union workers. If the lazy worthless b____ can't do the work she needs to stay home. She comes in here and drinks coffee and smokes cigarettes all weekend. Stop this s___.

CEO RESPONSE:
        As I responded to a similar comment, we need everyone to be fully engaged and productive.

Although the respondents' names were redacted from the comments that were posted on the bulletin board, the references to two women in the Project Maintenance Department were understood as identifying the respondents. Also, the parties agree that although the offensive terms in the comments were partially redacted, these terms were readily identifiable. At trial, the company acknowledged that the redactions "could have been done more effectively," given that the redactions did not keep the respondents from being identified. After the union complained about the comments, the company immediately removed them. The comments appeared on the bulletin board for two or three days. In addition to being posted on the bulletin board,

4

there was very brief testimony by one witness that the comments were placed on the company's intranet.[4] There was additional testimony that after the comments were removed from the bulletin board, the comments were copied and passed around at lunch tables, taped to the walls and shower room, and circulated around the plant. The respondents also presented general testimony that prior to the postings of the comments, the atmosphere at work was friendly. After the postings, however, respondents were shunned by co-workers and the atmosphere became one of "male against female."

The respondents filed their complaint against Constellium in February 2011 in the Circuit Court of Jackson County alleging gender discrimination in violation of the West Virginia Human Rights Act, W. Va. Code §§ 5-11-1, *et seq.* The respondents subsequently amended their complaint to allege claims for sexual harassment based on a hostile work environment. A three-day jury trial was conducted in December 2012, upon the conclusion of which the respondents were awarded $250,000 each for emotional distress as compensatory damages and $250,000 each in punitive damages, for a total verdict against Constellium in the sum of $1,000,000. Constellium timely filed post-trial motions for judgment as a matter of law or for a new trial, and requested a review of the punitive damages award. By order entered September 3, 2013, the circuit court denied Constellium's motions. Constellium appealed to this Court. In an October 17, 2014,

---

[4] The company's intranet was described at trial as the company's internal electronic communication system.

memorandum decision, this Court affirmed the circuit court's order. We subsequently granted the petitioners' petition for rehearing which we will now consider.

## II. STANDARD OF REVIEW

This is an appeal of a circuit court order that denied the petitioners' motion for judgment as a matter of law or for a new trial. This Court has held that "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). Further, "[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976). In addition, we are called upon to to review the propriety of granting punitive damages in this case. In doing so, we are mindful that

> [w]hen reviewing an award of punitive damages in accordance with Syllabus point 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), and Syllabus point 5 of *Alkire v. First National Bank of Parsons*, 197 W. Va. 122, 475 S.E.2d 122 (1996), this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award.

6

Syl. pt. 16, *Peters v. Rivers Edge Min., Inc.*, 224 W. Va. 160, 680 S.E.2d 791 (2009).

Having set forth the proper standards of review, we now proceed to consider the issues herein.

## III. ANALYSIS

### A. Sufficiency of Evidence of Hostile Work Environment

As noted above, the respondents brought their action under the Human Rights Act as a claim for sexual harassment based on hostile work environment. This Court has explained that "[t]he West Virginia Human Rights Act, W. Va. Code, 5-11-9(1) (1992), imposes a duty on employers to ensure that workplaces are free of sexual harassment from whatever source." Syl. pt. 8, *Hanlon v.* Chambers, 195 W. Va. 99, 464 S.E.2d 741 (1995). We further have indicated that

> [a]n employee may state a claim for hostile environment sexual harassment if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature have the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment.

Syl. pt. 7, *Id.* The elements of a hostile environment sexual harassment claim are as follows:

> To establish a claim for sexual harassment under the West Virginia Human Rights Act, W. Va. Code, 5-11-1, *et seq.*, based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive

7

work environment; and (4) it was imputable on some factual basis to the employer.

Syl. pt. 5, *Id.* Having reviewed the applicable law, we now proceed to consider the petitioners' assignments of error.

The petitioners' first assignment of error challenges the second and third factors in syllabus point 5 of *Hanlon.* Specifically, the petitioners assert that the evidence at trial clearly establishes that the allegedly wrongful conduct was not based upon the respondents' gender but was directed at their perceived work ethic. Also, the petitioners aver that the acts complained of by the respondents completely fail the "severe and pervasive" test for a hostile work environment.

In support of their argument, the petitioners contend that the gist of Mr. Keifer's comments about the respondents is in regard to their work ethic. Specifically, Mr. Keifer characterized the respondents as earning overtime wages for doing nothing but sitting around smoking cigarettes and drinking coffee. Second, the petitioners note that CEO Lager's responses to Mr. Keifer's comments made no reference whatsoever to gender. Third, the petitioners point to Mr. Keifer's testimony at trial that it was the respondents' actions, not their gender, that caused him to write the comments. Next, the petitioners cite numerous cases from other jurisdictions which they say support the proposition that statements about an employee's work ethic, including the term "lazy," are insufficient to support a claim for hostile work environment discrimination even if the

8

targeted employee is a member of a protected classification. Finally, the petitioners emphasize the fact that the three comment cards complained of by the respondents were among forty some cards posted at the same time referencing primarily male employees.

In reviewing the evidence below, we are mindful that this case was presented to a jury for a three-day jury trial, after which the jury found that the respondents presented sufficient evidence to establish a hostile work environment based on gender. As a result,

> [i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder*, 173 W. Va. 335, 315 S.E.2d 593 (1983). When we apply these standards to the evidence presented at trial, we find sufficient evidence to support the jury verdict below regarding the presence of a hostile environment based on gender.

First, one of the comment cards referred to Respondent Griffith as a "bitch" which this Court and other courts have found to be a gender-specific pejorative term that can be considered evidence of sexual harassment. In *Fairmont Specialty v. Human Rights Commission*, 206 W. Va. 86, 95, 522 S.E.2d 180, 189 (1999), this Court indicated that the use of the word "'bitch' certainly has overtones of gender discrimination." *See also*

9

*Passananti v. Cook Cnty.*, 689 F.3d 655, 666 (7th Cir. 2012) ("the word [bitch] is gender-specific, and it can reasonably be considered evidence of sexual harassment"). The petitioners point out Mr. Keifer's testimony that he had called a male co-worker "a lazy, worthless bitch" and had used the term "bitches" to refer to both male and female employees. This evidence, however, does not negate the gender-specific nature of the term "bitch." *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010) (explaining that referring to a man as a "bitch" "insults the man by comparing him to a woman, and, thereby, could be taken as humiliating to women as a group as well"). In the instant case, the gender-specific derogatory term "bitch" was used against the female respondents and constitutes evidence of a hostile work environment based on gender.

A jury could also have found that the language used in the comment cards was gender-biased based on evidence that the two respondents were criticized more harshly than their male counterparts. In addition to the three comment cards that were critical of the respondents, two comment cards were critical of a male employee. One comment card criticizing a male employee provided that

> _____ foreman has a bad attitude when you ask about a truck that you bring in or one that has been sitting there for 1 to 6 months. We need trucks to move metal not a smart a__ answer from the _____ foreman. (He cusses a lot, I don't like that.).

The second comment referring to a male employee stated:

10

> There is [sic] a lot of dirty and bad batteries in the Battery shop and they also need water. What does the Battery Shop person do besides read magazines and ride around and sell gun raffle tickets. We need someone to take care of the batteries.

It is significant that there are no gender-based epithets or offensive descriptions of these two male employees whereas the respondents were referred to by gender-specific pejorative language and specific parts of their bodies were characterized in a derisive manner. Specifically, the respondents were characterized as "lazy worthless bitches" with "big lazy asses." Therefore, a jury could conclude that while both genders were criticized for their work ethic, the criticism of the respondents was much harsher and of a more personal nature because of their gender.

Moreover, the jury could have inferred that CEO Lager endorsed the offensive criticism of the respondents. The jury could have inferred as much from the fact that CEO Lager posted the comments without adequately redacting the comments both to conceal the identity of the respondents as well as to remove the offensive terms used to describe the respondents.

Finally, there was testimony that after the offensive comment cards about the respondents were posted, the environment in the workplace went from being a friendly, family-type atmosphere to becoming "almost a class thing, almost male against female." The respondents adduced evidence that they were shunned by other employees and scheduled to work only with each other. There also was brief testimony that on one

occasion, Ms. Wall was not provided a "fire watch" to assist and watch over her while she was welding, and as a result she was injured. While the evidence indicates that neither the respondents nor the union complained about this conduct to management, the jury may have inferred that CEO Lager's publication of the offensive comments and his silent endorsement of gender-specific pejorative language encouraged an abusive environment based on gender. Therefore, we believe that there was sufficient evidence to support the jury verdict that the offensive treatment of the respondents was based on their gender.

The petitioners also contend that the evidence at trial was insufficient to meet the *Hanlon* "severe and pervasive" test for a hostile work environment. Again, we disagree. The offensive comments about the respondents were placed on a bulletin board where plant employees and others coming into and leaving the plant could read them. Also, Sharla Rose, an employee at the plant, testified that she saw the offensive comments on the company intranet after she saw them on the bulletin board. In addition, after the comment cards were removed from the bulletin board, copies of them were disseminated throughout the plant, including being passed around at lunch tables and taped to walls. We find that this evidence is sufficient to meet the severe and pervasive element of a hostile environment sexual harassment claim.

In sum, while the respondents' evidence at trial is far from overwhelming, this Court, giving to the respondents the benefit of all favorable inferences which

12

reasonably may be drawn from the evidence, concludes that the evidence is sufficient to support the jury verdict that the petitioners' wrongful conduct was based on the respondents' gender and was sufficiently severe or pervasive to create an abusive work environment. Accordingly, we affirm the circuit court's order that denied the petitioners' motion for judgment as a matter of law or for a new trial on the jury's finding of liability against the petitioners.

## B. Sufficiency of Evidence to Support Punitive Damages Award

In their second assignment of error, the petitioners aver that the circuit court erred in determining that there was sufficient evidence to satisfy the standards for the imposition of punitive damages under the facts of this case.

At the outset, we note that our review of whether a punitive damages award was proper involves a two-step inquiry:

> When this Court, or a trial court, reviews an award of punitive damages, the court must first evaluate whether the conduct of the defendant toward the plaintiff entitled the plaintiff to a punitive damage award under *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895), and its progeny. If a punitive damage award was justified, the court must then examine the amount of the award pursuant to the aggravating and mitigating criteria set out in *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992)[, *aff'd*, 509 U.S. 443 (1993)]."

13

Syl. pt. 6, *Perrine v. E.I. Du Pont De Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010). The question of whether the petitioners' conduct toward the respondents entitled the respondents to punitive damages is governed by syllabus point 4 of *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895), which states:

> In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.

In its order denying the petitioners' motion for relief from the award of punitive damages, the circuit court reviewed the respondents' evidence adduced at trial and concluded that "the jury could properly have concluded that [the petitioners'] posting of [the comment cards about the respondents] was motivated by malice and criminal indifference to the [respondents'] rights without regard to any basic notion of fairness." The petitioners contend that the facts of this case do not give rise to punitive damages. According to the petitioners, the essential facts are that the petitioners posted a single comment card containing the term "bitch" and three comment cards characterizing the respondents as "lazy." The petitioners posit that while they should have done a better job redacting the comment cards, they immediately removed the cards after two or three days in response to the union's request to do so. Regarding their failure to investigate occurrences of harassment subsequent to the removal of the comment cards, the

14

petitioners emphasize that neither the respondents nor the union made any complaints after the cards were removed.

The respondents reply that their evidence at trial indicates that they were subjected to more than the posting of unflattering comments about themselves. Instead, the posting of the comments with the CEO's endorsement signaled to the respondents' coworkers that it was "open season" on the two women in the workplace whom the CEO agreed were "lazy worthless bitches." In addition, say the respondents, because the petitioners undertook no investigation and corrective action to resolve the problems caused by the posting of the comment cards, the respondents were left on their own and forced to endure hostile workplace conditions for an extended period of time.

As noted above, the circuit court found that the evidence demonstrates the petitioners' malice and criminal indifference to the respondents' rights. With regard to malice, this Court has said that "[t]he foundation of the inference of malice is the general disregard of the rights of others, rather than an intent to injure a particular individual." *Addair v. Huffman*, 156 W. Va. 592, 603, 195 S.E.2d 739, 746 (1973). Because the respondents claimed a hostile work environment based on gender in violation of the Human Rights Act, in order to receive punitive damages the respondents had to demonstrate that the petitioners showed a disregard of their rights as women under the law. Similarly, in order to show criminal indifference to civil obligations affecting the rights of others, the respondents had to demonstrate that the petitioners acted with

15

knowledge that they may be violating the respondents' rights as women under the law. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (finding that Title VII's requirement of showing "malice" or "reckless indifference to the federally protected rights of an aggrieved individual" in order to qualify for punitive damages means the complaining party must demonstrate that the employer discriminated "in the face of a perceived risk that its actions will violate federal law").[5]

While the respondents met the standard for establishing a right to compensatory damages, we find that they failed to meet the higher standard required of plaintiffs in order to qualify for punitive damages under the Human Rights Act. *See Kolstad*, 527 U.S. at 534 ("Congress plainly sought to impose two standards of liability – one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award."). The evidence in this case simply fails to indicate the kind of repeated and continuing wrongdoing by the employer that demonstrates the employer's criminal indifference to the rights of women in the workplace recognized by the Human Rights Act. For this reason, we find that the circuit court erred in denying the petitioners' motion for judgment as a matter of law on the issue of punitive damages.

---

[5] This Court indicated in *Human Rights Comm'n v. Wilson Estates*, 202 W. Va. 152, 158, 503 S.E.2d 6, 12 (1998), that "Title VII is the federal analogue to our Human Rights Act." Also, this Court has a "longstanding practice of applying the same analytical framework used by the federal courts when deciding cases arising under the Human Rights Act." *Id.* (citation omitted).

## IV. CONCLUSION

For the reasons stated above, this Court affirms the September 3, 2013, order of the Circuit Court of Jackson County to the extent that it denied the petitioners' motion for judgment as a matter of law or for a new trial on the respondents' award of compensatory damages for their hostile work environment claims. However, we reverse the circuit court's order to the extent that it denied the petitioners' motion for judgment as a matter of law on the respondents' award of punitive damages.

Affirmed, in part, and reversed, in part.

17